[No. 22513. Department One. August 5, 1930.]

WILLIAM WILSON, *Respondent*, v. TIMES PRINTING COMPANY, *Appellant.*[1]

*J. Speed Smith* and *Henry Elliott, Jr.*, for appellant.
*Alex Wiley* and *Victoria Wiley*, for respondent.

PARKER, J.—The plaintiff, Wilson, seeks recovery of damages suffered by him in the death of his minor son, claimed as the result of the negligent driving of an automobile by the defendant Melvin Maxwell, as an employee and servant of the defendant printing company. A trial upon the merits in the superior court for King county, sitting with a jury, resulted in verdict and judgment awarding to plaintiff recovery against both defendants, from which the defendant printing company has appealed to this court.

[1]Reported in 290 Pac. 691.

The whole of the argument of counsel for appellant is made in support of their contention that the evidence introduced upon the trial of the cause calls for the conclusion, as a matter of law, that appellant is not liable in damages for the death of respondent's son, because Maxwell's relation to appellant was, at the time of the occurrence in question, that of an independent contractor and not that of an employee or servant, and that the trial court erred in refusing to so dispose of the cause instead of submitting it to the jury for determination. This calls for our noticing only the facts touching this question. They may be, we think, fairly summarized as follows:

Appellant is the publisher of an evening daily newspaper. We are here concerned with a delivery route of appellant's rural circulation. About January 26, 1929, Maxwell, then seventeen years old, entered into a contract with appellant by which he was to deliver papers to its week-day subscribers along a rural route of about forty-five miles, and to its Sunday subscribers along the same route extended to about sixty miles. It was understood that it would be necessary for Maxwell to carry the papers over this route by automobile, and that he was to furnish his own automobile. The contract was wholly oral. Its terms and nature must be gathered from the testimony of Maxwell and Cydell, appellant's superintendent of rural circulation, representing the printing company in the making of the contract with Maxwell.

Maxwell testified, in so far as need be here noticed, as follows:

"The boy who had the paper route told me he was going to give it up and asked me if I wanted it. That was about the 26th of January, 1929, when I went in to see the Times' manager about getting it. I saw Mr. Cydell. He told me I could have it. I was to get $98

a month for myself and the use of my car. I started receiving papers from the Times on February 1 and delivered them to the subscribers up to my accident. I received a check for $98 every month from the Times during this period. Mr. Cydell had the route list and so did the other paper boy. At the time I entered into this contract, Mr. Cydell gave me orders and complaints. I got a few complaints from him and a list of new subscribers later on. Mr. Cydell instructed me to deliver the papers as soon as they came to Renton. They almost always came to Renton at 2:30, and on Saturday they came into Renton about 1:30. He told me to leave Renton as soon as they came and to be there on time and to get them on time to the customers so they would not kick. I had to deliver them until I got them done until about 6 o'clock. He informed me how much to collect from each subscriber. I had to collect that much by the 10th of the month. I was instructed from time to time as to new subscribers, and got a bonus for getting them of 35c for each subscriber. Mr. Cydell, at the time this contract was entered into, told me if I did not get the papers around or could not handle it, I would be discharged. He said: 'Try to keep them from sending in complaints.' A list of subscribers was furnished me on a route running out of Renton. The papers were sent to Renton each day. A few complaints were made. These people either wrote or 'phoned the Times. The Times reported to me that the complaints had been made and instructed me not to give the customers any reason for complaint or I would be discharged. The subscribers paid me for the papers. The Times furnished me blank receipts. I do not know how much of the $98 was to be mileage and how much was to be salary. We did not discuss the point. I paid the Times one cent for every daily paper and six cents for every Sunday paper. Each month the Times would send me a statement of what I owed them.''

The company furnished Maxwell blank receipts to be given to the subscribers upon their paying him for their subscriptions, which blank receipts concluded

with the printed words: "Received payment for the company," followed by a blank line for Maxwell's signature.

Cydell testified, in so far as need be here noticed, as follows:

"I am employed by the Seattle Times as superintendent of motor routes for the rural circulation department. We show the carrier a statement on the first day of each month for all of the papers which he has received for the past thirty days, and he is charged at the rate of one cent for the daily and six cents for the Sunday's for all copies he has received during the current month, and off of this bill we deduct all papers which he returned for credit. This service mainly consisted of delivering the papers to the boxes in a particular manner so that they would be in the dry, out of weather conditions that might be detrimental to the papers. I explained to him that we had been paying George Morrison [the other boy having the route] the sum of $98 for the use of his car on the route, and that the Times realized that the boy was not earning over $60 a month approximately, on a commission basis, and could not afford to run a car on a stretch of 45 miles a day and 60 miles on Sunday without receiving compensation for some of the expense. I said we had arrived at a conclusion as to the cost of the automobile on our route and it was based on seven cents a mile. I believe this boy was furnished a list of subscribers by George Morrison, if he was ever furnished any list. The office gave out no list to any carrier. We ask the carriers for a list of the subscribers on all rural routes every two months. I have general overseeing of these route carriers and I check up on them all the time to see that they do the work properly. I hire them and fire them. From time to time we sent out solicitors over the routes. When a boy's route comes down a little he has the right to notify the office that he wishes a man sent out. From time to time we gave Maxwell a list of new subscribers to deliver papers to. We tell the driver to deliver it [the paper] where they [subscribers] wish it. I do not remember any place Maxwell was told to deliver

a specified paper outside of the usual delivery in the mail boxes. When the subscriber asks for it to be delivered on the porch instead of in the mail box, we personally go out and see the subscriber, and if we think the subscriber's request is within reason, we ask that the boy comply with the request. We expect him to comply with every request that is within reason. We have a net subscriber's rate which holds good all over the state of Washington as far as daily service is concerned. Carriers are not allowed to charge a different subscription rate.''

There was much more testimony given by both Maxwell and Cydell, but we think the foregoing constitutes a sufficient summary therefrom to determine whether Maxwell was an independent contractor or only an employee or servant of appellant.

We have here the following considerations, each of which, we think, points in some measure to Maxwell's being an employee or servant of appellant, rather than an independent contractor, in the performance of the work under his contract: (1) Appellant retained at least some substantial measure of control over Maxwell in the performance of his work under the contract; (2) The work under the contract was not to continue for any specified time; either Maxwell or appellant could terminate the contract relationship at any time; (3) Maxwell's earnings under the contract were, at least partly, in the form of stated monthly wages or salary, though his net earnings under the contract seem to have been largely in commission on the amount of business he did; (4) It was by the contract plainly contemplated that Maxwell was to personally do all that the contract contemplated to be done by him thereunder, rather than by his employment of others to do the work; (5) Maxwell did not contract to produce only a defined certain physical result the means or manner of doing which were wholly

of his own choosing; he was to, and did, work to the end not only of merely physically delivering the papers, but delivering them in such manner as to promote the good-will of appellant and in such manner as he might be directed from time to time by appellant's superintendent; (6) Maxwell was furnished blank receipts to be filled out and given by him to the subscribers for payment of their monthly subscriptions indicating upon their face that he "received payment for the company."

These considerations, though conceding that no one of them is entirely controlling, we think, call for the conclusion that it cannot be decided, as a matter of law, that Maxwell was an independent contractor, rather than an employee or servant of appellant. We have heretofore, on a number of occasions, somewhat extensively reviewed the law applicable to our present problem. It seems unnecessary to here do more than cite some of our prior decisions which we think support our present conclusion: *Glover v. Richardson & Elmer Co.*, 64 Wash. 403, 116 Pac. 861; *Simila v. Northwestern Imp. Co.*, 73 Wash. 285, 131 Pac. 831; *North Bend Lumber Co. v. Chicago, M. & P. S. R. Co.*, 76 Wash. 232, 135 Pac. 1017; *Dishman v. Whitney*, 121 Wash. 157, 209 Pac. 12, 29 A. L. R. 460; *Pyle v. 2-Miracle Concrete Corp.*, 126 Wash. 384, 218 Pac. 246; *Burchett v. Dept. of Labor and Industries*, 146 Wash. 85, 261 Pac. 802, 263 Pac. 746. The following also lend strong support to our conclusion: *Press Pub. Co. v. Industrial Acc. Commission*, 190 Cal. 114, 210 Pac. 820; 20 A. L. R. 753, note; 14 R. C. L. 67, *et seq.*

We conclude that the judgment must be affirmed. It is so ordered.

MITCHELL, C. J., TOLMAN, BEALS, and MILLARD, JJ., concur.