[No. 26880.   Department One.   March 23, 1938.]

EMILY SIMARD, *Respondent*, v. WESTERN UNION TELEGRAPH COMPANY, *Appellant.*[1]

[1]Reported in 77 P. (2d) 605.

*McMicken, Rupp & Schweppe* and *J. Gordon Gose,* for appellant.

*Padden & Moriarty* and *Wendell W. Duncan,* for respondent.

GERAGHTY, J.—This action was instituted by the plaintiff to recover from the defendant, Western Union Telegraph Company, for personal injuries sustained by her through the negligent operation of a bicycle by Hewitt Smith, who is alleged to have been, at the time of the accident, an employee of the defendant and engaged in its service. The cause was tried to a jury, which returned a verdict in favor of the plaintiff. After denial of a motion for judgment notwithstanding the verdict, the court entered judgment upon the verdict in favor of the plaintiff. The defendant appeals.

The single issue on the appeal is whether it can be said, as a matter of law, that the relation of Hewitt Smith to the appellant was that of independent contractor.

The only witnesses on this issue were Hewitt Smith and Douglas A. Dale, who had supervision of the appellant's messenger boys, both of whom were called by the respondent. Hewitt Smith, fourteen years of age and a student at the Lincoln high school, Seattle, testified that, in the first part of November, 1936, a bulletin was read in school stating that boys who had bicycles and would like to get jobs as messengers should see the boys' supervisor at school. After consulting the supervisor, he called on Mr. Dale and filled out a blank application for employment. At this time, also, he was measured for a uniform and told to call later. In the early part of December, he saw Mr. Dale again and was given a uniform to try, and told he would be called about the end of the week. Later, he was told to report Saturday, December 5th.

Smith reported at the appointed time, put on his uniform, and attended a class with about thirty other boys, when Mr. Dale told them what was to be done. Most of the boys had bicycles, but he did not know how many. One boy had to rent a bicycle. He did not see all the boys leave, but all of them that he saw left on their bicycles. On the back of his application, it was noted that he himself possessed a bicycle. The boys were given kits, being cardboard folders, with samples of greetings in them. They carried blanks around with them for taking orders, and purchasers of messages paid them the money, which they were to turn in to the office.

He stated that, at this first meeting, Mr. Dale told them that they were to receive five cents for each greeting sold; later, he was informed that they were to be paid in addition a flat rate of fifteen cents an hour. While he stated he found this out definitely after he quit working, he also said he made his first report to the appellant's office on the afternoon of Tuesday, December 8th, when he reported having worked twenty hours and selling four messages, and that he believed he was paid for his time at the end of the week. The accident occurred the night of the 8th.

Mr. Dale testified that he had control of the appellant's messengers in Seattle. He employed and discharged them and interviewed applicants. On instructions from the appellant's sales department, he took steps, early in November, to inaugurate a campaign for soliciting orders for Christmas greetings. Describing the plan, he testified:

"The idea of soliciting telegrams was to get orders for the Western Union and also to advertise to the public a service by Western Union. It includes establishing good will with customers. I had this in mind when I held the class for the boys, and that is why

I told them to be courteous. . . . We were interested in seeing that the whole city was covered in giving out these blanks and in advertising the special rates which the Western Union was putting on. That program was worked out on a large scale throughout the whole city, . . . We work the same system for Easter greetings and Mother's Day and Thanksgiving. It is a system for advertising the Western Union."

On the day when he instructed the class, December 5th, as to their duties, he told them that they would receive five cents for each greeting sold.

"Sometime the following week, I do not recall just when, we changed our minds as to this rate of pay, and through the branch offices informed the boys that they were to get fifteen cents an hour plus their five cents commission. The boys were instructed to turn in their number of hours for work since they had started, and they did, and we paid on that basis from December 5th on."

Regulation Western Union uniforms were furnished to the boys by the appellant. They included caps, shirts, ties, coats, and puttees. The caps bore the words "Western Union Telegraph Company," and the words "Western Union" were on the arm. The boys were instructed how to care for their uniforms and how to wear them. Each was given a copy of the appellant's manual of instructions to messengers containing the rules governing their conduct.

"These rules were applied to this group of boys along with others. They are rules as to appearance and demeanor. The reason for all these rules was that we wanted the boys to make a nice appearance for the Western Union and establish good will with the people. It is true that I told the boys what to do and how to do it, but I did not tell them when they should do their work nor where. I gave them a general territory, but did not tell them each particular house to go to."

Mr. Dale testified that the employment of Hewitt Smith ended Deccmber 25th.

"His employment, along with that of the rest of the group of boys, was intended to be for a limited time only, and the occasion of employing them at that time was to sell and distribute advertising during the Christmas campaign. . . . I told the boys to work after school and in the evenings if they wished to do so, and decided to pay them fifteen cents an hour, because they had not turned in many orders, and so that they would put in more time. We wanted them to go out and work afternoons and evenings and put in as much time as they could, and we knew they would work more for pay by the hour; they would distribute more blanks to people, and incidentally get more orders. . . . The boys were supposed to report their sales every three or four days, and Hewitt Smith was asked to report at· the University branch office, which is the closest accounting branch of the company to his home, being approximately two miles from his home."

As to the boundaries of the district assigned to each boy, he testified that they gave the boys outlines of boundaries so that there would be no duplication of advertising.

"They could work it, but we suggested that while they were out soliciting and laying down advertising that they be sure to get their particular boundaries first."

As to his measure of control over the boys who were employed, he testified:

"When we gave the boys uniforms we told them to take good care of them and return them when they were through with them. These uniforms were just loaned to the boys, and we could have gone and taken them away at any time. For example, if one of the boys had insulted a customer and he had called up the Western Union, we could have gone to the boy and told him to quit, and taken his uniform. I had the right to fire any of the boys, and would not want them to represent the Western· Union if their conduct

was not up to the standard we required, and we would have done this if necessary."

The appellant contends that the judgment of the trial court should be reversed on the authority of *Nettleship v. Shipman,* 161 Wash. 292, 296 Pac. 1056, and *Mitchell v. Maytag-Pacific-Intermountain Co.,* 184 Wash. 342, 51 P. (2d) 393. A cursory examination of those cases will disclose obvious differences between their facts and the facts in the present case. The facts here are more like those found in the case of *Wilson v. Times Printing Co.,* 158 Wash. 95, 290 Pac. 691. In that case, a seventeen-year-old boy held a rural newspaper route under contract with the Times Printing Company for the delivery of papers to its subscribers. After detailing the facts, the court said:

"We have here the following considerations, each of which, we think, points in some measure to Maxwell's being an employee or servant of appellant, rather than an independent contractor, in the performance of the work under his contract: (1) Appellant retained at least some substantial measure of control over Maxwell in the performance of his work under the contract; (2) The work under the contract was not to continue for any specified time; either Maxwell or appellant could terminate the contract relationship at any time; (3) Maxwell's earnings under the contract were, at least partly, in the form of stated monthly wages or salary, though his net earnings under the contract seem to have been largely in commission on the amount of business he did; (4) It was by the contract plainly contemplated that Maxwell was to personally do all that the contract contemplated to be done by him thereunder, rather than by his employment of others to do the work; (5) Maxwell did not contract to produce only a defined certain physical result the means or manner of doing which were wholly of his own choosing; he was to, and did, work to the end not only of merely physically delivering the papers, but delivering them in such manner as to promote the good-will of appellant and in such manner

as he might be directed from time to time by appellant's superintendent; (6) Maxwell was furnished blank receipts to be filled out and given by him to the subscribers for payment of their monthly subscriptions indicating upon their face that he 'received payment for the company.' "

The present case has all the distinguishing characteristics to which the court referred in that case, in some respects to a more marked degree.

The appellant certainly retained a large measure of control over Smith. It vested him in its livery. It could have stripped him of this uniform if he had by his deportment offended one of its customers. Mr. Dale had

". . . the right to fire any of the boys, and would not want them to represent the Western Union if their conduct was not up to the standard we required."

Smith's employment was not to be continued for any specified time. It could have been terminated at any time by himself or appellant. Unlike the fact in the *Wilson* case, here, any substantial earning made by Smith was on account of his hourly pay. The return from his sale of messages was negligible. He stated that he had sold only ten during his twenty days of service. He did not contract "to produce only a defined certain physical result the means or manner of doing which were wholly of his own choosing." He was not only to deliver the advertising matter and forms entrusted to him by appellant, but he was to do so with the demeanor and in the language best calculated to create good will and promote the advertising campaign program in which he was engaged. He was authorized to accept payment on behalf of the appellant from purchasers of messages, to be turned in to its district office at stated intervals.

A reading of Mr. Dale's testimony, frankly given as

it was, fairly justifies the inference that a principal object of the campaign, in so far as it related to the service of the boys employed, was to stimulate interest in the use of telegraphic greetings for Christmas, as well as for other occasions.

The relation of Hewitt Smith to the appellant was a mixed question of fact and law calling for submission to the jury; and, as it cannot be held, as a matter of law, that the relation was that of independent contractor, the judgment entered upon the jury's verdict must be affirmed.

STEINERT, C. J., MAIN, HOLCOMB, and SIMPSON, JJ., concur.