[No. 26882. Department One. April 12, 1938.]

GLENN ARMSTRONG, *a Minor, by his Guardian ad Litem, Myrtle H. Armstrong, et al., Appellants,* v. SPOKANE UNITED RAILWAYS, *Respondent.*[1]

*Edward M. Connelly, Michael J. Kerley,* and *Roy C. Fox,* for appellants.

*Post, Russell, Davis & Paine,* for respondent.

GERAGHTY, J.—This action was instituted by plaintiff Myrtle H. Armstrong, on her own behalf and as guardian *ad litem* of her son, Glenn Armstrong, against the defendant, Spokane United Railways, to recover for personal injuries sustained by the son as

[1]Reported in 78 P. (2d) 176.

the result of the alleged negligent operation of one of the defendant's street cars. The cause was tried to a jury, and, at the conclusion of the plaintiff's case in chief, the defendant moved for a nonsuit. The motion was granted, and a judgment of dismissal entered. The plaintiffs appeal. For convenience, the son will be referred to as if sole appellant.

The appellant, six years of age, was playing baseball with two older boys, Phillip Glenn, twelve years old, and Rodney Glenn, ten, in the yard of the parents of the Glenn boys. In the game, a large white "indoor baseball" was used.

The Glenn home faced west on Maple street, a north and south street in the city of Spokane. It was unpaved, but graded to a width of forty feet. It was occupied by the double tracks of a street car line operated by the respondent. Knox avenue, running east and west, intersected Maple street about one hundred feet south of the yard where the boys were playing.

The appellant was pitching from a position a short distance in from the sidewalk, midway between two small trees, the northernmost of which was the first base. Phillip was batting from a point some thirty feet east of the appellant, and Rodney, the catcher, stood behind Phillip. The nearest rail of the east track was about twelve feet out from the curb. Phillip struck what he called "a stiff grounder," which the appellant failed to catch. The ball took a direct course westerly, coming to rest at the curb on the opposite side of the street. The appellant ran after the ball, and, as he reached the track, came in contact with a northbound street car and was thrown under the front trucks. His right foot was crushed so badly as to require amputation above the ankle; the toes of his left foot were also badly crushed.

The street car was full of passengers returning home from work. Some were standing up in the aisle and others were in the vestibule occupied by the motorman. The car stopped on the south side of Knox avenue to discharge passengers, and, while crossing the avenue, the whistle was blown three times. If the course of the ball was straight west, as the evidence indicates, it would intersect the car tracks about one hundred feet north of Knox avenue. When the car came to a stop, the appellant was lying beside the track and a short distance in front of the rear trucks. The car stopped at a point between twenty-five and thirty feet north of where the appellant lay after the accident. The eye witnesses testifying were the three boys and a passenger on the car. We quote from the testimony of Phillip Glenn:

"A. Glenn pitched the ball and I give it a whack, a sort of grounder, and it rolled across the street. Glenn ran after it. When I got up to first base I seen the car and yelled. Glenn sort of tried to stop but the front trucks of the car hit him and run over him. Q. From where you were standing at the time you batted the ball, could you see the car on the street? A. No, I couldn't. Q. When did you first see the street car? A. Why, I saw it when I got up here to this tree [indicating the northernmost of the two trees referred to]. Q. This was your first base? A. Yes. . . . Q. . . . show us just as nearly as you can where you think the street car was when you first saw it. A. About along here [indicating a point about fifty feet north of Knox avenue]. I wouldn't know exactly. . . . Q. . . . Glenn was running in the same line that the ball had gone across the street, was he? A. Yes. Q. And you saw the street car coming towards him and yelled to try to stop him? A. Yes. Q. And did he make an effort to stop? A. Yes, he did. He skidded a little bit. Q. Could you tell which part of the street car hit him? A. It was the front trucks I am sure. Q. Could you tell whether the bumper of the street car hit him? A. No. . . . Q. And did

you notice where Glenn was lying with reference to the length of the street car after the street car stopped? A. About three or four feet in front of the back trucks."

In answer to a question as to when he first saw the car, he said he first saw it coming north on Maple street when he had run about half way to first base after striking the ball. The distance between the batter's position and the north tree (first base) was twenty feet. By the time he had covered the other ten feet to first base, the accident had occurred.

Rodney Glenn, Phillip's brother, testified that he had been playing on the lot for a week or maybe more. They had formerly played on a vacant lot across the street, at the corner of Knox and Maple, but had quit playing there because the people objected. Detailing what he saw at the time of the accident, he testified:

"Q. Now, when you saw the street car coming and Glenn running, you thought they were going to come together, did you? A. Yes. . . . Q. Did you see the car hit him? A. Yes. Q. Could you tell what part of the car hit Glenn? A. Yes. Q. What was it? A. The front trucks. Q. The front trucks. You saw the front trucks run over him? A. Yes. Q. From where you were standing, could you tell whether or not the bumper of the car hit him? A. I couldn't tell. . . . Q. Now, when you saw Glenn lying there on the ground after he had been run over, where was he with reference to those rear wheels? A. Oh, three or four feet in front of them."

On cross-examination:

"Q. As little Glenn came out there, he sort of slid, didn't he, Rodney? A. Yes, sort of braced himself. Q. And sort of slid down onto the ground like that (illustrating)? A. Yes. Q. And his feet, you say, went right under the front wheels there? A. Well, pretty close there. Q. He wasn't out on the street car track ahead of the street car and hit by the front end of it,

was he,—he went right into the trucks? A. Well, not right together, but out there a ways; a little in front, but not very far. . . . Q. And you would say then it [the car] and little Glenn were about fifteen feet apart? A. Yes. Q. That is, when he started to run out across the sidewalk? A. Yes. . . . By Mr. Fox: Q. Was it when he started to run out across the street or was he already running? A. Oh, he was already running. By Mr. Paine: Q. He had already started running from between the trees, but he hadn't got across the sidewalk, had he? A. Yes, I think he had. Q. You believe he had gotten across the sidewalk when what? A. When the street car was ten or fifteen feet away from him. Q. When you first saw the car, and it was about ten or fifteen feet away from him? A. Yes."

Mrs. J. A. Wilson, who was riding on the street car when the accident occurred, testified that she was sitting back in the fourth or fifth seat from the vestibule, just over the rear wheel of the front trucks, on the right-hand side of the car as it went north; she was seated next to the window. She testified further:

"A. Well, when he started up, he tooted the whistle two or three times and he didn't stop, slack up or anything, he just kept on going, and just before it got to the alley I felt the bump where the car went over the boy's foot. Q. Did he blow the whistle just before you felt that bump? A. No, not that I know of. Q. Had he blown the whistle after he crossed Knox at all to your knowledge? A. No. . . . Q. Where was the last point to your recollection that the motorman blew the whistle before the accident? A. Well, it was just as he passed Knox Avenue. . . . Q. Did you notice whether or not the motorman applied the brakes to the street car? A. Not until after the boy screamed, he did not. Q. . . . Was any gong rung or whistle sounded then? A. Not that I heard. . . . Q. Now, what was the condition of the car that you were riding on as to whether there were many passengers on it or not? A. Well, there was quite a few. There were a good many of them. There was quite a few of them in the vestibule talking to the motorman. . . . Q. And

what were they doing? A. They were talking to the motorman. Q. Was the motorman talking to them? A. Yes. Q. Was that before the accident? A. That was before the accident. . . . Q. Had that condition continued up to the time of the accident, would you say? A. Well, I couldn't say."

On cross-examination, she testified as to where she saw the boys playing and running from the car window:

"Q. Where did they run to? They ran to these trees, didn't they? A. They ran to the sidewalk. Q. Down onto the sidewalk, which was a paved sidewalk? A. Right in front of their house. Q. And then back up to the trees? A. Yes. Q. That is all you saw? A. Yes. Q. Then you turned away, did you, and the next thing you knew you felt a bump? A. Well, I just watched out the window. I didn't turn away, I just watched out the window. Q. But you didn't see the little boy run into the street car or the street car into the little boy, did you? A. No. Q. So, the next thing you knew was, there was a bump, is that right? A. Yes. . . . Q. And between you and the vestibule there were a number of people in the aisles and a number of people standing in the vestibule, were there not? A. Yes, a number standing in the vestibule and three or four standing in the aisle. Q. You could hear some conversation, you say, up in the front vestibule? A. Yes. Q. What were they talking about? A. I don't know, I didn't listen to them. . . . Q. All you could hear was some conversation up in the front vestibule, that is right, isn't it? A. Yes. Q. And between you and the place where the motorman stands is a partition, and then a door that leads out that way, and an entrance door coming in this way (indicating); and there is a wooden partition with glass in it, and usually some advertising there on the partition, advertising electric ranges, is that not correct? A. Yes. Q. So you couldn't actually see the motorman through the partition and the people that were in the front of the car? A. Well, I knew they were all in there. Q. You knew the motorman was there and the people were there and

that there was some conversation there, and that is all you know about it, isn't it? A. Yes."

Examined on his own behalf, Glenn Armstrong, the appellant, testified:

"Q. Now, do you remember Phillip batting the ball when you threw it to him there along late in the evening or about 5:30 in the evening? A. Yes. Q. And where did the ball go when he batted it? A. It went across the street. Q. What kind of a ball was it, a fly or grounder? A. Grounder. Q. Did it go pretty fast? A. Yes. . . . Q. What did you do after the ball went past you? A. I ran after it. Q. Now, when the ball went across the street did you see the street car coming up the street? A. No. Q. Had you heard the whistle blow that you recall? A. No. Q. Well, what did you go across the street for, or start across the street for? A. I was after the ball. . . . Q. Were you running? A. Yes. Q. Now, when did you first see the street car, or did you see it? A. After I got hurt, I think. I am not sure though. . . . Q. When you got to the street car track, did anybody yell at you or did anything attract your attention to the street car? A. Phillip yelled at me. Q. And how close were you to the track then? A. I don't remember. Q. After Phillip yelled did you try to stop? A. Yes. Q. What did you do? A. I slid. Q. You braced your feet to stop, did you? A. Yes. Q. And what happened to you? A. Well, I slid. Q. Where was the street car at that time? A. Pretty near on me. Q. It was pretty near on you when you braced your feet to stop? A. Yes. . . . Q. Now, do you know what part of the street car hit you, Glenn? A. Yes. . . . Q. What part of it was it? A. The front part. . . . Q. You don't know whether the back wheels went over you or not? A. The front trucks went over me. . . . Q. Do you remember where the ball was when you last saw it, Glenn, or when you started across the street to get it? A. It was in front of me. Q. Was it across the street from you or which side of the street was it on? A. It was going across to the east [west] side. . . . Q. Did the ball go fast or slow? A. Quite fast. Q. Did it go faster than you could run? A. Yes."

The question is whether there was such evidence of the respondent's negligence as required submission of the cause to the jury as the trier of the facts.

The respondent not only had a legal right, but was under a public duty, to maintain its tracks and operate its cars for the carriage of passengers on Maple street. The occurrence of the accident does not, of itself, charge the respondent with liability, unless it failed in some duty it owed the appellant. In considering the measure of this duty, it is to be borne in mind that a greater degree of care is owing to children of tender years than to persons of mature judgment.

In the present case, if the respondent was primarily negligent, there can be no question of contributory negligence on the part of the appellant, since, in the absence of evidence to the contrary, it will be presumed that a child of his age was incapable of contributory negligence. *Gregg v. King County*, 80 Wash. 196, 141 Pac. 340, Ann. Cas. 1916 C, 135.

There is no evidence that the respondent's car was running at an excessive rate of speed. Mrs. Wilson testified that the speed was not slackened after the car crossed Knox avenue. She testified that one passenger, seated with her, had arisen to leave the car at the next intersection. Doubtless, at this time of day, the stops were frequent and to be anticipated by the motorman, so that, it may be assumed, the speed of the car was normal under the circumstances. If the respondent is to be held liable, it must be because the motorman failed in keeping a proper lookout for children playing in or adjacent to the street.

The appellant argues that the neighborhood was a populous one; that numerous children were accustomed to play in vacant lots and yards adjacent to the streets; and that the motorman was familiar with this condition and under a resultant duty to observe a com-

mensurate degree of vigilance. Populous is a word of relative significance. Certainly, the neighborhood of the accident was not a congested one, nor could it be called populous in a sense of implying high density of population. The neighborhood would appear to be one of detached cottages, with occasional vacant lots where children were wont to play. There was no public playground adjacent to Maple street. The yard where the appellant was playing at the Glenn home was relatively small and not a place of resort for neighborhood boys generally, although it was testified that other children from nearby homes had come there to play with the Glenn boys.

The degree of care demanded in favor of children seen near a street car track is stated in 2 Thompson on Negligence, 98, § 1428:

"This calls up for consideration the question of the care demanded on the part of the driver, gripman, or motorman, in favor of children whom he sees near the track. If he sees them approaching the track in dangerous proximity to it, it will be negligence in him to fail to slacken the speed of his car; and, as he is bound to keep a constant *lookout*, negligence will be imputed to the company where he *might have seen* a child coming upon the track in time to have checked or stopped his car so as to avoid injuring the child, if he had been looking. But, in general, he is not bound to take special precautions because children are at play in the vicinity of the track, where their proximity is not apparently dangerous, and where they evince no purpose of thrusting themselves into danger. For example, the gripman of a cable car, proceeding at the rate of twelve miles an hour, who sees children playing in the roadway of the street near the curbstone, is not bound to anticipate that one of them will run suddenly in front of his car, and is not blameworthy because he does not slacken speed in anticipation of such a possibility. He is not bound to bring his car to a full stop, merely because he sees a child five or six years old *on the sidewalk*, to guard against a similar possibility. Nor is he

blameworthy for failing to anticipate that a boy more than eleven years old will, *after warning,* attempt to cross a street so nearly in front of the car that an accident can not be prevented."

Obviously, there was not time, after it became apparent that the appellant was darting into the street, to stop the car and avoid an accident. Rodney Glenn testified that, when he first saw the street car, the appellant was ten or fifteen feet away from it and had passed from the sidewalk into the street. If this was the position of the car, it must have been at a point almost directly opposite appellant, since the track was but twelve feet from the curb.

The reasonable inference from the evidence is that the appellant darted suddenly across the street after the ball and struck the car at or near its front. It is not clear whether he was struck down by the fender or steps, or slid under the wheels when he braced himself in an attempt to stop. Mrs. Wilson testified that, after passing Knox avenue, she saw the boys playing in the Glenn yard, running down on the sidewalk and back again to the trees in the yard. If she, a passenger, saw this, the motorman saw, or should have seen, it. But, under the rule quoted from Thompson on Negligence, it cannot be held that he should have foreseen that one of the boys might suddenly run into the street in front of the car.

Mrs. Wilson testified that several passengers occupied the vestibule where the motorman was stationed, and that he spoke to them. Her cross-examination implied that she assumed the motorman was talking because he was in the vestibule and others were there and conversation was carried on. But, taking her testimony in the most favorable light to the appellant, it amounts to no more than that there was conversation carried on in the vestibule and that the motorman took

part in it. She did not testify that the motorman's attention was otherwise in any way distracted from his duty to keep a lookout ahead.

The appellant argues that, as the ball crossed the track, it would have challenged the motorman's attention if he had kept the proper lookout to the danger.

The motorman was, of course, charged with notice of the ball's passage, but, as the appellant immediately pursued the ball, it could not have warned the motorman in time to avoid the accident.

Considering the evidence from the view most favorable to the appellant, as required by the rule to which we have heretofore referred, we are unable to escape the conclusion that the trial court was warranted in granting a nonsuit, and that its judgment should be affirmed.

STEINERT, C. J., MAIN, HOLCOMB, and SIMPSON, JJ., concur.