[No. 26775. Department Two. July 12, 1938.]

FRANK FEMLING, a Minor, by Ralph Femling, his Guardian ad Litem, et al., Respondents, v. STAR PUBLISHING COMPANY, Appellant.[1]

[1]Reported in 81 P. (2d) 293.

396

*Ralph S. Pierce, Edwin J. Cummins,* and *Gordon H. Sweany,* for appellant.

*Maslan & Maslan,* for respondents.

*The Attorney General, Lyle L. Iversen, Assistant, Neal, Brodie & Trullinger, Todd, Holman & Sprague, Tanner & Garvin,* and *Bayley & Croson, amici curiae* on rehearing.

ROBINSON, J.—Respondent Ralph Femling brought this action on his own behalf and as guardian *ad litem* of his infant son Frank Femling to recover damages for medical expenses incurred by himself and for personal injuries suffered by his son as a result of a colli-

sion with a bicycle ridden by Norman Lindjord, a newspaper carrier and assertedly the servant of appellant, Star Publishing Company.

The cause was tried to a jury, which returned a verdict for respondents in the amount of one thousand dollars to the injured boy and seventy-five dollars to the father. From a judgment entered on that verdict, appellant appeals.

Appellant's position is that the evidence failed, as a matter of law, to show that Norman Lindjord was negligent or that he was the servant of appellant. Accordingly, appellant assigns as error the facts that the court refused to sustain appellant's challenge to the sufficiency of the evidence, refused to direct a verdict for appellant, and refused to grant appellant's motion for judgment notwithstanding the verdict. Appellant introduced no evidence in defense, except with respect to the extent of the boy's injury, and now relies wholly upon the asserted insufficiency of respondents' evidence. Inasmuch as the case presents two distinct problems, we shall state, separately, the facts bearing upon each question.

The facts relating to the alleged negligence of Norman Lindjord are as follows: The accident occurred on Greenwood avenue near the southeast corner of Greenwood and north Eighty-fourth street, in Seattle. Greenwood avenue is an arterial street. The time was 3:30 p. m. on September 24, 1936. The weather was clear, and the asphalt pavement was dry. Norman had just received his newspapers and was starting out on his bicycle to deliver them to the subscribers on his route. The papers, which weighed a little over forty pounds, were piled in a rack attached to the front of the bicycle.

Norman was riding north on Greenwood avenue and down a 4.9% grade. He was traveling at ten or twelve

miles per hour and riding about six feet from the right-hand curb. There was no other vehicular traffic near. A large truck was parked at the east curb of Greenwood with its front end about five feet south of the south line of the pedestrian crosswalk on north Eighty-fourth street. As Norman approached the intersection, he looked ahead and, according to his testimony, did not see anyone crossing, or about to cross, the street. He did not slacken his speed. As he came alongside the truck, he was about one foot from it. As he drew abreast of the motor hood of the truck, respondent Frank Femling, not quite four years old, "hurried" out from the shelter of the truck directly into Norman's path. Norman saw him, yelled, swerved his bicycle sharply to the left, and threw on his brake, but to no avail—Frank was struck and knocked down in the street with sufficient force to break his leg and to cut his head. Norman stopped within three feet from the point of collision.

Since Frank was but little more than a baby, the case presents no question of contributory negligence. *Von Saxe v. Barnett,* 125 Wash. 639, 217 Pac. 62; *Armstrong v. Spokane United Railways,* 194 Wash. 353, 78 P. (2d) 176.

It is insisted that Frank was not on the crosswalk but to the south of it, but no one claims that he was more than four feet from it at the most, and the jury had a right to find that he was so near that the matter is not at all material. *Goninon v. Lee,* 119 Wash. 471, 206 Pac. 2; *Horney v. Giering,* 132 Wash. 555, 231 Pac. 958.

So far as we are advised, there is no statute regarding the speed of bicycles at crossings or otherwise. The vehicle code in force at the time of the accident expressly excludes conveyances propelled by muscular power. Rem. Rev. Stat., § 6362-2 (a) [P. C. § 196-2].

It is now necessary to go back a little in time to see how Frank came to be where he was. The Femling family lived on north Eighty-fourth street about a block east of Greenwood avenue. Frank had an older brother, Jerry, then aged five years. Frank, Jerry, and another five year old identified only as "Sonny" were going somewhere to play. They proceeded west on north Eighty-fourth. When they came to Greenwood avenue, Jerry and Sonny crossed to the west side, but Frank did not. Jerry testified that he and Sonny stood on the curb and that he shouted to Frank to stay where he was until he (Jerry) came to get him. Jerry then started back across Greenwood to get Frank, and he was in the street and "over on Frankie's side" when the accident occurred.

Respondents introduced the testimony of a so-called "bicycle expert," a man who ran a large bicycle repair shop. This witness testified that a bicycle like Norman's, loaded as Norman's was, and ridden as Norman's was ridden, would take fifteen feet to stop and would be sluggish and hard to control. On cross-examination, however, he admitted that Norman, who had had three years' experience in riding with a large load of papers on his bicycle, would be able to control the bicycle "much better than the average boy."

Appellant asks this court to say that these facts are, as a matter of law, insufficient to charge Norman Lindjord with negligent operation of his bicycle, and that the trial court erred in submitting this issue to the jury and in accepting the jury's verdict.

It is well settled in this jurisdiction that:

"A challenge to the sufficiency of the evidence or a motion for nonsuit admits the truth of plaintiff's evidence and all inferences that can reasonably be drawn therefrom, and requires that the evidence be interpreted most strongly against the defendant, or in the light most favorable to the plaintiff." *Buttnick v.*

*J. & M., Inc.,* 186 Wash. 658, 59 P. (2d) 750; *Kedziora
v. Washington Water Power Co.,* 193 Wash. 51, 74 P.
(2d) 898.

It is likewise settled that a court is not warranted
in granting judgment notwithstanding the verdict
unless it can be said that there is neither evidence
nor reasonable inference from evidence sufficient to
sustain a verdict. *Corbaley v. Pierce County,* 192
Wash. 688, 74 P. (2d) 993; *Kedziora v. Washington
Water Power Co.,* 193 Wash. 51, 74 P. (2d) 898.

This court has, however, also laid down a rule
that negligence must be shown by "substantial evi-
dence—a scintilla of evidence will not do." *Dunsmoor
v. North Coast Transportation Co.,* 154 Wash. 229, 281
Pac. 995; *Hansen v. Continental Casualty Co.,* 156
Wash. 691, 287 Pac. 894; *Cartwright v. Boyce,* 167
Wash. 175, 8 P. (2d) 968; *Haydon v. Bay City Fuel
Co.,* 167 Wash. 212, 9 P. (2d) 98.

In deciding whether or not Norman Lindjord was
negligent, we must ask this question: Would a rea-
sonable person in Norman's position, with Norman's
knowledge and experience, have foreseen that a child
might suddenly appear from in front of the parked
truck? The parties impliedly concede that, after Nor-
man saw Frank, he did everything possible to avoid
striking him. Accordingly, our inquiry must be di-
rected to the situation immediately preceding the time
that Frank hurried out into the open street from in
front of the truck.

Norman, with forty pounds of papers on the front
of his bicycle, was riding downhill at ten or twelve
miles per hour and approaching an intersection. The
pavement was dry, and he knew that he could swerve
his bicycle sharply and stop it in a very short distance.
He chose to ride only one foot from the side of a parked
truck. If these were all the facts, we should be pre-

pared to say that, as a matter of law, he was not negligent. But there is an additional fact, or at least the jury was entitled to find that Norman saw or should have seen Sonny and Jerry, two five year olds, standing on the curb across Greenwood, and that he saw or should have seen Jerry start back across the street to the east side; that is, that there were small boys playing about the crossing.

It is axiomatic that, when one sees children in the street or has other notice of their presence or the likelihood of their presence in or near his line of travel, then the amount of care necessary to constitute reasonable care is very great. It is common knowledge that from small children one can expect almost any kind of heedless and impulsive conduct.

Appellant relies on *Haydon v. Bay City Fuel Co.*, 167 Wash. 212, 9 P. (2d) 98, to which may now be added *Armstrong v. Spokane United Railways*, 194 Wash. 353, 78 P. (2d) 176. In the *Haydon* case, a child darted out from behind a large mail box into the path of a truck. It was held that the truck driver was not negligent. But in that case there were no children visible in the vicinity, and there was nothing to warn the driver of the presence of the child. In the *Armstrong* case, children were playing baseball in a private yard fronting defendant's street railway tracks. One of them, in retrieving the ball, ran out into the street and into the front of defendant's street car. This court held that the motorman was not negligent, as he had given sufficient warning of his approach and as he had no reason to suppose that one of the boys would run into the street until it was too late to prevent the accident.

In the case at bar, Norman gave no warning of his approach to the crossing and did not slacken his speed,

402

and there was evidence from which the jury could find that one small boy was already crossing the street in front of him, although the evidence to that effect is somewhat tenuous, being given by the actor himself who was but five years old at the time and only six at the time of the trial. However, neither the court nor adverse counsel questioned his competency to testify, and the record shows that his testimony was very clear and direct. We quote from his direct examination as follows:

"Q. Where were you standing at the time that Frankie was hit? A. Frankie was hit on that side and I was on that side too (indicating). I was just going to get him over there. I was over on that side too when the bicycle hit him. Q. You mean you had crossed the street already? A. Yes. And then I went over on the other side. And then the bicycle hit Frankie. Q. Were you on the same side of the street with Sonny? A. Yes, sir—no, Sonny was across the street and I was on the side Frankie was."

On cross-examination, he testified, in part, as follows:

"Q. Then, Jerry, did you go across the street with Sonny when he went across? A. Yes, sir. Q. And the accident happened when you were across the street? A. No, sir. The accident happened when I was over by Frankie. Q. Had you gone across the street and then back again to Frankie? A. Yes, sir. Q. How far were you from Frankie when it happened? A. Frankie was about here and I was about here (indicating). Q. You were right close together? A. Yes, sir."

We can well understand the feeling of the trial judge when, in ruling upon the defendant's challenge to the sufficiency of the evidence and motion for a nonsuit, he said:

"I just cannot help but feel this boy was not responsible for this unfortunate situation. I am going, however, to let the matter go to the jury."

We think, however, that he was precluded from determining the matter as a question of law and that his ruling, however reluctantly made, was correct. *Bulger v. Yamaoka,* 111 Wash. 646, 191 Pac. 786; *Lee v. Independent Dairy,* 127 Wash. 622, 221 Pac. 309.

■ The second question presented is of equal, if not greater, difficulty. The appellant contends that there was insufficient evidence to warrant the jury in finding that the Star Publishing Company exercised such measure of control over. Norman Lindjord as to make it responsible for the results of his negligence. It is contended that the evidence established as a matter of law that Norman was an independent contractor. The written contract between the publishing company and Norman was as follows:

"Agreement and Surety

"In consideration of being given the privilege of buying papers from The Star Publishing Company, of Seattle, Washington, during such time as said company may elect, at the rate of $1.10 per hundred copies, I agree to sell my papers only on route designated and to abide by the following rules and conditions and any other rules and conditions which may be in effect now or hereafter.

"(1) I will deliver the said papers to its subscribers promptly and regularly and immediately upon their arrival on six days of each week at the established rate of 50c per month, or 2c per single copy.

"(2) I will be careful to throw papers where they may be readily seen and picked up by subscribers and on rainy days every paper will be positively delivered in some protected place.

"(3) I will make collections for papers promptly each month and pay my monthly bills for papers to The Star Publishing Company not later than the 26th day of each current month.

"(4) I will deliver free of charge, to any news stand now existing, or which may be hereafter established, on my route.

"(5) I will keep a regular list of subscribers in a neat form, showing the date to which each subscriber has paid. I understand that this list, including all new subscribers secured by me, as well as all other books, lists, or information relating to the route, or THE SEATTLE STAR, for the keeping of the subscriptions, or any other purpose, are obtained by me solely in my capacity as dealer, and are facts and information acquired only by reason of my being permitted to enter into this agreement and to fulfill its terms and conditions; and hereby agree that all rights and title to these subscriptions, list, books and information pertaining to the distribution of THE SEATTLE STAR are vested in THE STAR PUBLISHING COMPANY, and I agree to turn the same over to THE STAR PUBLISHING COMPANY on demand.

"(6) I will, at all times, keep a satisfactory substitute, familiar with the route, to act in my place in case of illness.

"(7) I will not take the agency for, nor sell, any other newspaper without the consent of THE STAR PUBLISHING COMPANY.

"(8) I will do all in my power to build up and extend the circulation of THE SEATTLE STAR.

"(9) Under no consideration will I cease to deliver papers to subscribers without securing a person satisfactory to THE STAR PUBLISHING COMPANY to take my place.

"(10) It is clearly understood that I am not an employee of THE STAR PUBLISHING COMPANY in any sense. I am to buy from the company and pay for all papers delivered to me.

"(11) It is further understood and agreed that this agreement may be canceled at any time, at the discretion of THE STAR PUBLISHING COMPANY, and that I will go around with the new carrier or dealer, without charge, a sufficient number of times to enable him to become thoroughly familiar with the route.

"Signed this 7th day of January, 1936, at 9606 8th Ave. N. W.

"This agreement is not     (Signed) NORMAN LINDJORD
valid until accepted by
> THE STAR PUBLISHING COMPANY
>> Address   9606 8th Ave. N. W.

"Accepted by Urban Harris
> THE STAR PUBLISHING COMPANY

"I hereby certify,.That I am the parent of the carrier (or dealer) named in the above agreement, and I hereby guarantee the fulfillment in every particular of the said agreement by the said carrier.
> "(Signed) JACOB LINDJORD
> "(Signed) MRS. J. LINDJORD."

It will be noted that the contract recites that the carrier shall not be "an employee of The Star Publishing Company in any sense." But, of course, a master, if he actually be such, cannot exonerate himself from his legally imposed liability to a third person for injury resulting from the misconduct of a servant by the simple expedient of "contracting" with the servant that he is to be free from the master's control. Since respondents were not parties to this contract, they could introduce parol evidence to show the real relation of the parties. *Watson v. Hecla Mining Co.*, 79 Wash. 383, 140 Pac. 317.

Respondents introduced a great deal of evidence to show the amount of control exercised by appellant over the details of the work of Norman and the other carriers. Nearly all of this evidence dealt with a so-called "Carrier Check Chart." This chart hung in the vacant garage where the carriers got their papers and held their meetings and was kept up to date by appellant's "district manager." "Credits" were given for: No complaints from subscribers of poor service, having a Star savings account, having no extra papers, good collections, no unrenewed subscriptions, good scholastic standing, courtesy and neatness, punctuality, an in-

crease in the number of subscribers over the previous month, prompt payment of bills owed to appellant, good bookkeeping, new subscribers, furnishing a record of subscribers transferred to new routes, good sales presentation, regular attendance at carrier meetings, and good team cooperation. "Deductions" were made for the antitheses of these excellent qualities and habits. A select group of carriers, with a very high check chart standing, was rewarded each year with scholarships to the University of Washington. Those carriers who failed to come up to a certain standard were "subject to immediate dismissal or release from route." While we do not attach as much importance to this "check chart" as the respondents urge it deserves, it does tend to show that the publishing company exercised a much greater measure of control over its carriers than is ordinarily exercised over independent contractors.

To insure good service to its subscribers, appellant also imposed petty fines on carriers who did not take care of a new order, or had too many complaints, or had a prior complaint from the same subscriber, or gave irregular service, *or delivered a paper late,* or left a paper in a damp place.

The carriers were required to be on hand when the papers arrived at the appointed place, to start immediately on their routes, *and to be through by about 5:30 p. m.* They were not directed how to cover their routes—they could go on foot, on horseback, by bicycle, by automobile, or by any other means, so long as they covered them promptly and properly—and they were not directed as to what streets they must traverse nor in what order they were to serve their customers; all of these details were, in practice, left to the carriers. Appellant's district manager knew, however, that Norman used a bicycle on his route. The carriers' only

compensation was the difference between the fifty cents collected monthly from each subscriber and the $1.10 per hundred papers paid to appellant. They were expressly empowered to make subscription contracts on behalf of appellant.

Appellant concedes that Norman Lindjord was an agent for certain purposes, but denies that he was a servant for any purpose. It is, of course, true that one may be an agent, in the sense of one who represents his principal in contractual matters, without being a servant, that is, without performing personal service under the control of his principal. *American Sav. Life Ins. Co. v. Riplinger,* 249 Ky. 8, 60 S. W. (2d) 115; *Stockwell v. Morris,* 46 Wyo. 1, 22 P. (2d) 189; *American Nat. Ins. Co. v. Denke,* 128 Tex. 229, 95 S. W. (2d) 370, 107 A. L. R. 409; American Law Institute Restatement of Agency, §§ 1, 2; 2 C. J. S. 1029; 2 Am. Jur. 16.

Appellant contends that Norman Lindjord was shown, as a matter of law, to be not a servant, but an independent contractor, at least so far as his bicycle riding was concerned. It argues that Norman came within the definition of "independent contractor" laid down in *Leech v. Sultan R. & Timber Co.,* 161 Wash. 426, 297 Pac. 203, to wit:

"That is to say, an independent contractor is one who engages to perform a certain service for another, according to his own manner and method, free from control and direction of his employer in all matters connected with the performance of the service, except as to the result of the work."

Our own, and, we think, the great majority of other, authorities are in substantial agreement that:

"The test by which it is determined whether the relation is that of employer and employee [master and servant] or that of independent contractor is whether or not the employer retained the right, or had the right

under the contract, to control the mode or manner in which the work was to be done." *Sills v. Sorenson,* 192 Wash. 318, 73 P. (2d) 798.

See, also, *Larson v. American Bridge Co.,* 40 Wash. 224, 82 Pac. 294, 111 Am. St. 904; *Glover v. Richardson & Elmer Co.,* 64 Wash. 403, 116 Pac. 861; *North Bend Lumber Co. v. Chicago, M. & P. S. R. Co.,* 76 Wash. 232, 135 Pac. 1017; *Machenheimer v. Department of Labor & Industries,* 124 Wash. 259, 214 Pac. 17; *Burchett v. Department of Labor & Industries,* 146 Wash. 85, 261 Pac. 802, 263 Pac. 746; *Hinds v. Department of Labor & Industries,* 150 Wash. 230, 272 Pac. 734, 62 A. L. R. 225; *Swam v. Aetna Life Ins. Co.,* 155 Wash. 402, 284 Pac. 792; *Mitchell v. Maytag-Pacific-Intermountain Co.,* 184 Wash. 342, 51 P. (2d) 393; *Carlson v. P. F. Collier & Son Corp.,* 190 Wash. 301, 67 P. (2d) 842; 14 R. C. L. 68; American Law Institute Restatement of Agency, § 2; 19 A. L. R. 235.

Appellant insists that, before it can be held liable for Norman's negligence, the evidence, or the inferences from evidence, must show that appellant had the right to control Norman *in the operation of his bicycle.* In other words, appellant insists that the relation of master and servant must be shown to have existed at the time of, and in respect to, the very act or thing which caused the injury.

The record is clear that appellant did not actually control this phase of Norman's work nor attempt to control it. But the authorities are practically unanimous in making it clear that the test is *right to control,* and not actual control, and that the non-existence of actual control is merely evidence upon which to determine the basic fact. The question is not—*Did* appellant control Norman? but—*Could* it have controlled him? It is this second question which appellant asks the court to answer, as a matter of law, in the negative.

We are of the opinion that the jury could well have found that appellant had the right to tell Norman *where* to go and *when* to go. We cannot say that it could not also have found that appellant had the right to tell him *how* to go. It will be noted that, in the first paragraph of the written contract, Norman not only agreed to abide by the rules and conditions therein contained, but also "any other rules and conditions which may be in effect now or hereafter." He was not, in terms, required to use a bicycle, but the requirement, which the evidence shows was quite rigidly insisted upon, that he complete his route by 5:30, plus the fact that he carried a one hundred and fifteen paper route, certainly rendered the use of a bicycle highly desirable, if not actually necessary.

The case appears to fall within the rule of *Wilson v. Times Printing Co.*, 158 Wash. 95, 290 Pac. 691, and *Simard v. Western Union Tel. Co.*, 194 Wash. 169, 77 P. (2d) 605, rather than within the rule of *Nettleship v. Shipman*, 161 Wash. 292, 296 Pac. 1056, and *Mitchell v. Maytag - Pacific - Intermountain Co.*, 184 Wash. 342, 51 P. (2d) 393.

The nature of the relationship in question could not be determined by the trial court as a matter of law. The verdict of the jury must be accepted as to this question, as well as to the other.

The judgment appealed from is affirmed.

BEALS, MILLARD, and BLAKE, JJ., concur.

STEINERT, C. J. (dissenting)—I think that it should be held, as a matter of law, from the facts presented, that the rider of the bicycle, Norman Lindjord, was not guilty of negligence. I think, further, that it should be held, as a matter of law, from the undisputed facts, that the Star Publishing Company had neither the con-

trol, nor the right of control, over Norman Lindjord in the operation of the bicycle or in the distribution of the newspapers. I therefore dissent.

ON REHEARING.

[*En Banc.* December 9, 1938.]

ROBINSON, J.—The judgment in this cause was affirmed in a Departmental decision, one judge dissenting. A rehearing was later granted, and, after reargument *En Banc,* a majority of the court, including the author of the Departmental opinion, have reached the conclusion that the decision therein made was erroneous.

A reconsideration of the record has convinced us that it contains no evidence which would warrant a jury in finding that Norman Lindjord was negligent. In the former opinion, it was held that the case was governed by *Bulger v. Yamaoka,* 111 Wash. 646, 191 Pac. 786, and *Lee v. Independent Dairy,* 127 Wash. 622, 221 Pac. 309. In the first of these cases, it appears definitely that there were children playing in the street, and that there was evidence, also, which warranted the jury in finding that, in the use of ordinary care, the driver of the automobile could, or should, have seen the respondent in time to have avoided the collision. In the second case, a driver had parked a milk truck in the street at a place where several children were playing upon the adjacent lots, sidewalks, and parking strips. After making a delivery, he started to back up to the street intersection without giving the warning of a short blast, followed by a long blast, required by the city traffic ordinance then in force. That conduct, of course, constituted negligence *per se.*

In the instant case, there is no evidence of the violation of any ordinance, and none from which a jury could

find that young Lindjord should have seen the small boy in time to have avoided the collision. It was held, however, in the Departmental opinion, that there was evidence that children were playing in the street, and that this evidence raised a question for the jury as to whether or not Lindjord should have anticipated that a small boy might run out from in front of the parked truck. The decision was placed entirely upon this ground.

We find, upon a reexamination of the record, that, accurately speaking, there is no evidence therein that would have warranted the jury in finding that children were *playing* in the street. There is evidence which would have warranted the jury in finding that young Lindjord saw, or should have seen, a small boy leave the west side of the street en route to the east side. But it appears that he was traveling upon the crosswalk, and we agree with appellant's contention that there is nothing in the fact that he was crossing the street which should have caused Lindjord to anticipate that a small boy might come out from in front of the truck on the other side.

We are, therefore, constrained to hold that there is no proof that the boy respondent received his injury on account of any negligence of Norman Lindjord. The occurrence must, we feel, be regarded purely as an unfortunate accident. Having arrived at this conclusion, it is unnecessary to review the other questions presented.

The former opinion in this case, and the whole thereof, is set aside and held for naught.

The judgment appealed from is reversed and the cause is ordered dismissed.

STEINERT, C. J., MILLARD, GERAGHTY, and SIMPSON, JJ., concur.

BEALS, J., dissents.

MAIN, J. (dissenting)—It is my view that this case was correctly decided in the Departmental opinion, to which I adhere. I therefore dissent.

HOLCOMB and BLAKE, JJ., concur with MAIN, J.