[No. 26457. Department One. May 6, 1937.]

FRANCES G. CARLSON et al., Respondents, v. P. F. COLLIER & SON CORPORATION et al., Appellants, F. D. FLOYD et al., Defendants.[1]

[1]Reported in 67 P. (2d) 842.

Roberts & Skeel and W. R. McKelvy, for appellants.

E. D. Phelan, Padden & Moriarty, and Earl F. Requa, for respondents.

MILLARD, J.—While operating an automobile owned by C. H. Pope, and in which Frances G. Carlson was riding, F. D. Floyd fell asleep and ran the automobile off the road and down an embankment, as the result of which Mrs. Carlson was injured.

This action was instituted by Frances G. Carlson and husband to recover from P. F. Collier & Son Corporation, C. H. Pope, F. D. Floyd, and two others (which individuals were alleged to be the employes of the defendant corporation), for personal injuries sustained by Mrs. Carlson in the accident described above. The trial of the cause to the jury resulted in a verdict in favor of the plaintiffs against P. F. Collier & Son Corporation, C. H. Pope, and F. D. Floyd, in the sum of twenty thousand dollars. From the judgment entered, motions for judgment notwithstanding the verdict and for a new trial having been overruled, C. H. Pope and the defendant corporation appealed.

Counsel for appellant Pope raise the question whether the respondents were guilty of contributory negligence in riding in the coupe in view of its crowded condition, five persons (including the respondents) being seated in that automobile. This question of contributory negligence, which is a question of fact, was submitted to the jury under proper instructions.

The P. F. Collier & Son Corporation will be designated appellant.

Counsel for appellant first contend that there is no evidence to justify submitting the question of agency to the jury. It is insisted that the trial court should have dismissed the appellant, as a matter of law, for the reason that the respondents did not sustain the burden of proving that the appellant had the right to control Floyd and Pope.

As may be expected, the evidence is sharply conflicting. However, the following testimony, if true—its verity is established by the jury's verdict—warranted the conclusion by the jury: (1) that transportation by automobile was indispensable to the proper performance of appellant's work, in which respondent wife and other members of the soliciting crew were engaged; (2) that appellant, for its own benefit, as an inducement to those employes to engage in the solicitation of subscriptions and as a part of the consideration for the employes' performance of that work, agreed to, and did, impose upon itself the duty of providing a cheap method of transportation, utilized by respondents and other solicitors, although the cost of that transportation was paid by the members of the crew of solicitors; (3) that appellant, in the kind of work in which it was engaged, was required to carry on its operations away from its central place of business in Seattle and out of the presence of its officers, and, in carrying on that work, the appellant delegated

to Floyd the duty of providing transportation for the crew of solicitors to, from, and while the solicitors were engaged in the performance of, appellant's work; and (4) that respondent wife was injured by the negligence of Floyd, while providing transportation.

The accident out of which this action arose occurred near North Bend, Washington, between eleven p. m. and twelve midnight, October 20, 1934. Frances G. Carlson, her husband, Pope, Floyd, and a Mr. Cameron were riding in a Pontiac coupe owned by C. H. Pope. At the time of the accident, F. D. Floyd was the operator of the automobile. Appellant, publisher of a magazine, was engaged in a special drive for magazine subscriptions. That drive was limited as to time and was conducted in connection with a special premium offer which appellant was making to subscribers during the period of the drive. Respondents were employed by appellant as solicitors of magazine subscriptions.

Approximately three weeks prior to the accident, appellant's manager in Seattle organized a crew of solicitors to put on a drive for subscriptions in the Ellensburg, Wenatchee, Yakima, and Pasco territory. The crew of which respondents were members was sent to eastern Washington in an automobile chosen by appellant in which to transport the crew and their equipment. The automobile was in charge of a Mr. Moran, who was selected by appellant's Seattle manager to furnish the transportation.

Each member of the crew worked on a commission basis. Because of the small returns to the solicitors and the necessity of keeping the crew together as a unit to the more efficiently carry on the drive for subscriptions, it was essential that cheap automobile transportation be furnished to the crew. The solic-

itors paid all of their own expense, no expenses being allowed to them by the appellant.

Pope was compensated by appellant on a strictly commission basis. However, he was allowed mileage for his traveling, which was fixed by a determination of the railroad fare between the respective points of travel. While he was allowed to use any form of transportation he desired, he was paid no more or less than what the train fare would be, regardless of the manner of transportation utilized by him. Appellant did not own the automobile and did not contribute anything toward its upkeep. Each member of the crew paid to the driver of the automobile used for the transportation of the crew twenty-five cents and the cost of the gasoline for the use of the automobile during the trip.

When the crew departed from appellant's office, F. D. Floyd was placed in sole charge of the crew. Upon him was imposed the duty of providing transportation throughout the trip. The furnishing of this transportation included the carriage of the crew and their equipment to the locality of the drive for subscriptions and in the territory through which the drive was conducted, and also back to the Seattle office of the appellant when the drive was completed in the territory to which the crew was assigned. Upon the completion of the drive in such territory, the crew was required to return to the Seattle office to be assigned to other territory in the drive for subscriptions.

The original driver selected by appellant quit the crew at Yakima. Floyd, with the sanction of appellant, employed another driver, who also quit during the course of the campaign for subscriptions. At Yakima, the crew was without transportation. Instructions were received by them to depart from Yakima for Pasco. Floyd directed the crew to use a public

bus and to proceed to Pasco, Kennewick, Sunnyside, and Prosser.

When there, Floyd obtained the car and services of C. H. Pope, who was in the employ of appellant as a collector and a verifier. Pope's territory was east of the Cascade mountains, with headquarters in Yakima. Pope transported the crew around Sunnyside and Prosser, and back to Yakima. Floyd then took the crew by bus to Ellensburg. Floyd communicated with appellant's Seattle office and requested further automobile transportation. Appellant's Seattle office arranged with Karl Seigel and wife to go to Ellensburg for the purpose of transportation of the crew from Ellensburg to Wenatchee, and, while on the subscription drive in Wenatchee, the Seigels reported to Floyd and carried on the transportation as alleged.

It also appears that there was an understanding that the Seigels were to transport the crew in the Seigels' automobile to Seattle, and that it was customary for appellant, as stated above, not only to transport the crew to the place of the subscription drive and during the time of the drive in that territory, but also back to appellant's Seattle office, where the crew were to be assigned to other territory. The Seigels notified Floyd, during the afternoon of October 20, 1934, that they were not returning to Seattle; that they intended to go to Selah to visit relatives. Floyd then entered into an arrangement with the Seigels to carry the crew to Cle Elum, and then arranged for the use of Pope's automobile to transport the crew to Seattle.

Mr. and Mrs. Carlson were ordered by Floyd, when they arrived at Cle Elum, to get out of Seigel's automobile and go to Seattle in Pope's automobile. Pope operated the automobile a part of the journey from Cle Elum toward Seattle, but immediately prior to the accident Floyd relieved Pope at the wheel. While op-

erating the automobile, Floyd fell asleep and ran the automobile off the road into a ditch, and, as a result of that accident, Mrs. Carlson was injured. There is no question as to the negligence of Floyd.

The evidence fairly shows, or it is reasonably inferable from the testimony, that the transportation by automobile was necessary and beneficial to the appellant, and was compulsory upon the solicitors. The special, systematic campaign for magazine subscriptions was of a limited duration and was aided by the offer of a special premium of a globe to each subscriber. Organized crews were placed in a particularly limited territory, designated by the officers of appellant at its Seattle office, to work the territory within the time limited and pursuant to the plan of operation fixed by appellant and required by it to be followed by the crew. The crew had to keep together and work as a unit in order to fully canvass each particular town to which assigned.

Each crew was organized in Seattle. At that place, an automobile was provided to transport them, the premium globes, and the magazines to the territory in which the campaign for subscriptions was to be conducted. The crew stayed at the same hotel in that territory. They started out from the hotel each morning with their samples, and by means of automobile the members of the crew and their equipment were taken to the particular location to be worked that day.

On arrival at the location, Floyd would drop one member of the crew here, another there, and allot a special district in the location to each solicitor. This was done to avoid interference of the solicitors with each other and to assure a thorough canvass of the territory. At noon, the members of the crew would be picked up by the automobile and returned to their hotel. After luncheon, they would start out again to-

gether and work during the afternoon in the manner like unto that of the morning. At night, they returned to the hotel, and, after dinner, they discussed their work and the problems of that day.

It was necessary to have an automobile for transportation from town to town because of the inconvenient schedule of busses, and because, by use of an automobile, they could, in small territories, canvass several towns. When a place was thoroughly canvassed, they would move, when directed by Floyd to do so, to another territory and canvass it as in the manner outlined above. The members of the crew were required to work on a schedule, and it was necessary that they do so because they were followed the next day by C. H. Pope, who was employed by appellant as a verifier. It was his duty to check the orders received by the members of the crew, and to either approve or disapprove the orders. He also distributed to the subscribers the premium globes, and, of course, it was necessary that the members of the crew work on schedule because the subscriptions had to be forwarded to the Seattle office immediately in order to effect delivery to the subscribers at once under the premium offer made to induce them to subscribe.

It also appears that it was not optional for the employes to use the designated automobile, but that it was compulsory (except in an emergency, and when designated by Floyd), under penalty of quitting the crew. It is clear that the appellant, as an inducement for solicitors to engage in the subscription campaign, did provide means of transportation for the solicitors to and from and on the work.

There is testimony that, the Saturday before the crew of which respondents were members departed from Seattle, the crew was organized by appellant's Seattle manager, arrangement made for an automobile,

the crew required to go together in that car, and they were instructed to report the next Monday, to be carried in a car to be designated by the Seattle office. When the crew reported on Monday, the automobile was not ready. They were told to return the next day. The next day, they were ordered to get into an automobile operated by Mr. Moran. The crew had no voice in the selection of this means of transportation. The office manager of appellant placed Floyd in charge and instructed the operator of the automobile to take all his orders as to transportation from Floyd.

The crew went to Yakima, where they campaigned approximately seven days. Moran resigned. Floyd wrote to the Seattle office and also advertised for a car. He employed a Mr. Williams and notified the Seattle office to that effect also. He directed the crew to use the Williams' automobile. Williams resigned. Floyd again telegraphed the Seattle office for transportation. The crew was directed to go to Pasco by bus, as no automobile transportation was obtainable. When at Pasco, Floyd determined the time to be given to each small town and entered into an agreement with C. H. Pope for transportation in and about several small towns. Floyd sent respondents to Prosser and Grandview, and, under an agreement with Pope, the latter transported them to those points. The crew returned to Yakima by bus, and then to Ellensburg.

Floyd telegraphed the Seattle office for transportation. In response to that request, the Seattle office sent Karl Seigel and wife to take care of the remainder of the transportation of the crew. The Seigels were instructed to report to Floyd, which they did. The crew went from Ellensburg to Wenatchee in Seigel's car and conducted the subscription campaign in that city in Seigel's car.

Respondents started back to Seattle in Seigel's car,

but Seigel refused to go beyond Cle Elum. Floyd then entered into an agreement with Pope to substitute his car for Seigel's for the trip to Seattle. The respondents had nothing to do with this arrangement. Floyd directed the Carlsons to get into the Pope car and insisted that the crew stay together as a unit.

Some of the witnesses testified that furnishing means of automobile transportation was a special inducement to them to work as solicitors for appellant; that they could not have afforded to engage in that work, and would not have accepted the position of solicitor, if the appellant had not obtained the cheap automobile transportation for them.

When Mrs. Carlson left Seattle to join the crew, she was instructed by appellant's Seattle office to report to Floyd and that he would furnish the transportation. She reported to Floyd, who put her to work and notified the office. The obtaining, providing, and directing transportation was the duty imposed by the appellant upon Floyd, who was in full and sole charge of this function. Floyd designated where the members of the crew were to work, how, and when they were to work. He was in charge of the supplies and sales materials. The crew turned their orders in to him, and any dealings had with the verifier in checking these orders were between the verifier and Floyd.

Once or twice a week, Floyd reported to the Seattle office what the crew was doing. Communications between the crew and the office were carried on through Floyd, and one of his functions was to employ solicitors. The checks in payment of the services of the members of the crew were sent to Floyd to be distributed to the payees.

Floyd was the *alter ego* of the appellant. He was a vice-principal, and was by the principal delegated to perform the principal's duty of providing transporta-

tion. The evidence is positive that upon Floyd the appellant conferred the authority to keep the crew together; that he was placed in full charge of the crew, which was ordered to follow his directions as to transportation and other details, and that upon Floyd alone was imposed the duty of obtaining and directing the transportation of the crew to the territory to which they were assigned, in the territory in which they worked, and the return of that crew to the Seattle office.

█ The duty of employer or master to exercise reasonable care is a non-delegable duty, and the failure of a principal's *alter ego* or vice-principal to exercise the care required is negligence of the employer or vice-principal. On this campaign, who was in charge of the crew and the automobile transportation? No one other than Floyd, who was appellant's vice-principal. He was in control as that corporation's representative. If Floyd was not a vice-principal in charge of the crew and the transportation, then the solicitors were without any vice-principal in control as a representative of appellant. However, as stated above, the evidence accepted by the jury as true shows that Floyd was the vice-principal of the appellant. If he was not a vice-principal in charge of the crew and automobile, then the members of the crew were without any vice-principal in control as a representative of the master, a condition which could not be assumed to have existed.

"If he was not a vice principal in charge of the men and car, then they were without any vice principal in control as the representative of the master, a condition which could not be assumed to have existed and certainly ought not to have been tolerated." *Tills v. Great Northern R. Co.,* 50 Wash. 536, 97 Pac. 737, 20 L. R. A. (N. S.) 434.

In *Tills v. Great Northern R. Co., supra,* a section foreman in charge of a handcar which all the members were propelling by hand on the way to their work was held to be a vice-principal. We held that the master was liable for injuries sustained by a member of the crew through negligence of the vice-principal where it appears that by the vice-principal's direction, knowing they had soon to meet a train, the handcar was driven at a reckless rate of speed downgrade over a tortuous piece of track. When the train came into view, the foreman made sudden application of the brakes without warning, as the result of which the plaintiff was thrown from the handcar and injured. In that case, the fact that the section foreman assisted in propelling the car and applied the brakes was urged to sustain the contention that the foreman was not a vice-principal, but was a fellow servant. In holding otherwise, we said:

"We fail to see that he changed his relation to the appellant or respondent by personally applying the brake instead of directing one of the men to do so."

and quoted, with approval, the following from *Haworth v. Kansas City Southern R. Co.,* 94 Mo. App. 215, 68 S. W. 111, where it was said:

"A superior or vice-principal in charge of workmen does not become a co-workman whenever he actively assists in the manual performance of a task, instead of superintending it. If he chooses to take on himself the role of laborer he may do so, but he does not thereby divest himself of his responsibility as foreman or superintendent and his duty to see that work is done in a careful way. The judgment and care which he must use as superintendent to see that precautions are taken to avoid harm to his gang, continue to be exacted of him by the law, although he may have stepped down from his pedestal for an interval. *Russ v. Railroad Co.,* 112 Mo. 45; *Dayharsh v. Railroad Co.,* 130 Mo. 570; *Steube v. Iron Co.,* 85 Mo. App. (St. L.) 646. Dyson

was Haworth's superior, and the superior of all the men in his crew. He was selected by the defendant company to direct the operation and movement of the car as well as to control the other work of the hands under him; he was in fact directing them, and the company is liable for his negligent act or omission while so doing."

Floyd had authority from the Seattle office to do anything which may be fairly and reasonably regarded as incidental to the work specifically directed or which is usually done in connection with such work. The automobile, while not owned by the appellant, was supplied by it as one of the inducements to the employment, which indicates that the operation of the vehicle is part of the master's work.

In *De Parcq v. Liggett & Myers Tobacco Co.*, 81 F. (2d) 777, a traveling salesman for the tobacco company picked up and carried a passenger in his automobile, and, while so carrying him, negligently injured the passenger. The court held that, in spite of a rule of the company which forbade the carriage of a passenger by the salesman, the question of the salesman's implied authority was for the jury.

"Thus, a servant is authorized to do anything which is fairly and reasonably regarded as incidental to the work specifically directed or which is usually done in connection with such work. The scope of employment includes not only such acts but also other acts which, as between master and servant, the servant is not privileged to do. . . . The fact that the master contracts to supply a vehicle or that the supplying of a means of access to the work is one of the inducements to the employment indicates that the operation of the vehicle is part of the master's work." 1 Restatement of the Law of Agency, American Law Institute, § 229.

Mrs. Carlson and the other members of the crew were specifically instructed to work under the supervision of Floyd and to take orders from him, not only as

to transportation, but as to all the details of the work in which they were engaged as solicitors in the drive for subscriptions.

The well-settled rule that, where an employer tells an employe to work under the instructions of a co-employe, the co-employe is a vice-principal of the employer and the employer is liable for the negligence of the vice-principal, is applicable to the facts in the case at bar. *Johnson v. Motor Shingle Co.*, 50 Wash. 154, 96 Pac. 962. See, also, *Berger v. Metropolitan Press Printing Co.*, 61 Wash. 35, 111 Pac. 872, in which we held that, where an employe in a printing shop was ordered by the foreman to work under the directions of a pressman, the latter was a vice-principal when he called upon the former to assist in placing a belt upon a pulley.

■ At the time of the accident, Floyd was working within the scope of his employment and had implied authority to operate the automobile. Floyd, as the servant or vice-principal of the appellant at the time of the accident, was performing an act in furtherance of the master's business. He was engaged in the transportation of the crew and keeping the members of that crew together until they arrived in Seattle, as he was directed to do, when the crew would be assigned to other territory. The operation of the car by Floyd was within the scope of his employment, although it was not necessary for the proper performance of his duty to his master. That duty he could have delegated to another, or he could, as he did, perform it himself.

In 39 C. J. 1282, § 1472, is the following statement of the rule respecting the test of liability under doctrines of *respondeat superior:*

"The primary test to determine the master's liability for the act of his servant under the doctrine of re-

spondeat superior is whether the act was within the scope of his employment. The test is not the character of the act, nor whether it was done during the existence of the servant's employment; but whether the injury complained of was committed by the authority of the master expressly conferred or fairly implied in the nature of the employment and the duties incident to it. The master will be liable for the acts of the servant within the scope of the employment whether the acts are expressly or impliedly authorized.

"What within scope of authority generally. It is a principle embodied in the very relation of master and servant that whatever is done by the employee in virtue of his employment and in furtherance of its ends is deemed by the law to be an act done within the scope of employment. No general rule can be formulated which will determine in each case whether the servant was acting within the scope of his employment, the authority from the master generally being gatherable from the surrounding circumstances. Acts may be said to be within the scope of the servant's employment where specifically directed, or where they are clearly incidental to the master's business. It is not essential that the act be specially authorized by the master. An act is within the scope of the servant's employment, where necessary to accomplish the purpose of his employment, and intended for that purpose, although in excess of the powers actually conferred on the servant by the master. So long as the servant has done some act in furtherance of the master's business, he will be regarded as acting within the scope of his employment, although he may have exceeded his authority. So also the act may be within the scope of the employment, although it is not necessary for the proper performance of the servant's duty to his master, or although it is not in the interest of the master, or in furtherance of his business, or although it even may be an obstruction and hindrance to the master's business. A servant's failure to perform his duty in the exact manner contemplated by the master does not relieve the latter from liability for the servant's negligence. In some decisions it has been held or said, in effect, that there can be no implied authority to do an act

which it would not be lawful under any circumstances for the master himself to do; but this rule does not prevent the holding of the master liable for the wrongful or excessive exercise of the servant's discretion in a case where the act done would have been lawful if the supposed circumstances had been real. An act will not necessarily be considered as within the scope of the servant's employment merely because the injuries complained of would not have been committed without the facilities afforded by the servant's relations to his master, nor merely because the act was committed during the period covered by the servant's employment, nor merely because the servant supposed that he possessed authority to do the act in question.

"Power to prevent act. If the act causing the injury is within the scope of the servant's employment, the master is liable, although he could not have prevented the act causing the damage.

"Where it is doubtful whether a servant in injuring a third person was acting within the scope of his authority, it has been said that the doubt will be resolved against the master because he set the servant in motion, at least to the extent of requiring the question to be submitted to a jury for determination."

The rule is well-settled that the principal is liable for the negligent acts of his agent, within the scope of his employment in the course of his duties, resulting in injuries to the person or property of another. It must be borne in mind that, although the work of the members of the crew was completed at the time they departed from Cle Elum for Seattle, the appellant was obligated, because of its agreement, to provide transportation back to the Seattle office upon the completion of the subscription campaign in eastern Washington. The duty of transportation of respondents and other members of the crew to the territory where they were to be employed and the returning of those solicitors to Seattle, the starting point, was a duty expressly assumed by the appellant and was the inducing factor

to accept employment as solicitors. The rule just stated is so well-established as to need no citation of sustaining authority.

The fact that appellant did not own the automobile which Floyd was operating at the time of the accident is not a determinative factor. The applicable rule is stated, as follows, in 87 A. L. R. 787:

"If the circumstances involved in the case show that the activity in which the servant was engaged at the time of the tort complained of was within the scope of his employment, the fact that the automobile or other vehicle used by him, and which caused the injury, belonged to or was hired by the servant, will not preclude the person injured from recovering from the employer, if the servant's use of the vehicle was, either expressly or impliedly, authorized by the employer."

See, also, *Dahl v. Moore*, 161 Wash. 503, 297 Pac. 218.

■ We cannot agree with the theory of appellant that, because upon Floyd the obligation was imposed to procure cheap transportation, he was therefore an independent contractor, for whose acts the appellant could not be liable. We are familiar with *Swam v. Aetna Life Ins. Co.*, 155 Wash. 402, 284 Pac. 792, and *Leech v. Sultan R. & Timber Co.*, 161 Wash. 426, 297 Pac. 203, cited by appellant. Those authorities do not sustain the position of appellant. The two authorities cited recognize the rule enunciated in 31 C. J. 474, and do not, in either of the two cases, depart therefrom.

Whether a person performing work for another is performing it as an independent contractor or as the employe of that other is a question not always easy of solution, but, as we held in *Glover v. Richardson & Elmer Co.*, 64 Wash. 403, 116 Pac. 861, the authorities agree that the test of the relationship is the right of control on the part of the employer. We there said:

"Whether a person performing work for another is performing it as an independent contractor or as the

servant or employee of that other is a question not always easy of solution, but all of the authorities agree that the test of the relationship is the right of control on the part of the employer. Thus in 26 Cyc. 1546, an independent contractor is defined as follows:

" 'An independent contractor is one who, carrying on an independent business, contracts to do a piece of work according to his own methods, and without being subject to the control of his employer as to the means by which the result is to be accomplished, but only as to the result of the work. Generally the circumstances which go to show one to be an independent contractor, while separately they may not be conclusive, are the independent nature of his business, the existence of a contract for the performance of a specified piece of work, the agreement to pay a fixed price for the work, the employment of assistants by the employee who are under his control, the furnishing by him of the necessary materials, and his right to control the work while it is in progress except as to results.'

"Shearman & Redfield in their work on Negligence offer this definition:

" 'The true test of a "contractor" would seem to be, that he renders the service in the course of an independent occupation, representing the will of his employer only as to the *result* of his work, and not as to the means by which it is accomplished.' 1 Shearman & Redfield on Negligence (5th ed.), §164.

"In 16 Am. & Eng. Ency. Law (2d ed.), p. 187, this definition is given:

" 'Generally speaking, an independent contractor is one who, in rendering services, exercises an independent employment or occupation, and represents his employer only as to the results of his work, and not as to the means whereby it is to be accomplished. The word "results," however, is used in this connection in the sense of a production or product of some sort, and not of a service.'

"And this court in *Larson v. American Bridge Co.*, 40 Wash. 224, 82 Pac. 294, 111 Am. St. 904, said:

" 'The general test which determines the relation of independent contractor is that he shall exercise an independent employment, and represent his employer

only as to the results of his work and not as to the means whereby it is to be accomplished. The chief consideration is that the employer has no right of control as to the mode of doing the work; but a reservation by the employer of the right to supervise the work, for the purpose of merely determining whether it is being done in accordance with the contract, does not affect the independence of the relation.' "

The *right to control* is the test of the relationship. It is clear that, not only did the appellant have a right to control Floyd, but it also shows that it actually and positively controlled Floyd as to the manner and method and the time and all of the details in connection with his providing the transportation. We repeat that it was not only necessary, but was compulsory, for Floyd to use an automobile, except in an emergency where an automobile could not be had. In two cases, the manner in which the crew was to be transported was designated and chosen by appellant.

It will be remembered that, on the Saturday before the crew departed for eastern Washington, the appellant arranged with Moran, and designated him as the one, to transport the crew. When he was not present on Monday to transport them to eastern Washington, they were directed by appellant to return on Tuesday and to travel in Moran's car to eastern Washington. When Moran resigned, Floyd selected Williams for this work. This hiring was approved by appellant. When Floyd requested appellant to furnish transportation for the crew, appellant selected the Seigels and ordered them to report to Floyd and to furnish the transportation for the rest of the campaign. Floyd testified that he was at all times subject to the directions of appellant's Seattle office as to where he would work, what territory he would cover, how he would canvass it, and that he was appellant's representative in the field.

■ Appellant next assigns as error the refusal to grant a mistrial on the ground that the matter of insurance was brought before the jury by counsel for respondents. It is argued that, during the trial, the court ordered appellant to produce an insurance contract in its possession. When the contract was produced, counsel for respondents refused to offer the contract in evidence.

The defense pleaded in the answer to the complaint was that Floyd and Pope were independent contractors. When such a defense is pleaded, it is proper to negative it by showing that the party defendant covered the car in question by liability insurance.

In *Robinson v. Hill,* 60 Wash. 615, 111 Pac. 871, we said:

"It is true this court has, in a number of cases, held it to be error to inject into the case the fact that a defendant in a personal injury suit is protected by insurance of this character, and such is the undoubted law; but here was a sharp conflict between the parties as to who was running the mill at the time of the accident and who, if either, as between appellant and Pineo, was to respond for the injuries sustained by respondent. Any evidence touching this issue was admissible, and it was competent to show, as an admission by appellant of his liability, that he had previously taken out insurance to protect himself from the very thing which had happened. The admission of this evidence was carefully guarded by the court, and the jury instructed to consider it for no other purpose. Under such circumstances, there was no error."

In the annotation of 85 A. L. R. 784, on the question of the admissibility of evidence of this character, as bearing on the question of whether one is an employe or an independent contractor, is the following summarization of the rule followed in a number of the states:

"If an issue in the case is as to whether the plaintiff was a servant of the defendant or whether he was an independent contractor or servant of an independent contractor, evidence is admissible that the defendant carried indemnity insurance on his employees, including the plaintiff, such evidence having been treated in some cases as having a tendency to negative the independence of the contract, or, in other words, as having a tendency to show that the plaintiff was considered by the defendant as his employee."

There was evidence, also, that "all men that have a car for P. F. Collier & Son are supposed to sign some sort of a blanket insurance." There is other evidence from which it would appear that, when an automobile was in use for appellant, for the purpose of transporting crews and bringing them home, there was a contract between the owner of the automobile and appellant "in regard to insurance on the car." If appellant carried indemnity insurance, such evidence would have a tendency to show that the operator of the automobile was considered by the appellant as its employe. That would come under the rule stated above. We are clear that the assignment is without substantial merit.

Error is next assigned upon the refusal of the trial court to reduce the verdict of twenty thousand dollars awarded to Mrs. Carlson. Mrs. Carlson was thirty-eight years of age at the time of her injury. Prior to the time of entering the employment of the appellant, she was earning in excess of $6.50 a day in the operation of a restaurant. In her employment sometime prior thereto as a saleslady and as a demonstrator, she earned approximately thirty dollars weekly.

Before we can interfere with a verdict of a jury, the verdict must be so grossly excessive as to be without support in the evidence, or it must appear that the

verdict was the result of bias, prejudice or passion. *Dorian v. Boone,* 152 Wash. 681, 279 Pac. 107. This lady suffered a broken back, a deformity of the spine, an injury to the nerves of the legs, an impediment in walking, and also sustained a cancer in one breast. Under the mortality tables, her earnings would exceed forty thousand dollars. Her medical and hospital expenses amount to twelve hundred dollars, and she is now confronting, because of her injuries, further medical and hospital expense. We cannot say that the award is excessive compensation for what this woman has already endured and which she is reasonably certain to endure in the future.

Our examination of all the instructions discloses that the jury were correctly instructed, and that no error was committed in refusing to give the instructions requested by appellant.

We have carefully examined the record and find no reversible error therein. Therefore, the judgment should be, and it is, affirmed.

STEINERT, C. J., GERAGHTY, MAIN, and BLAKE, JJ., concur.