. [No. 27293. Department Two. May 24, 1939.]

WASHINGTON RECORDER PUBLISHING COMPANY, *Respondent*, v. CHARLES F. ERNST, *as Director of the State Department of Social Security, et al., Appellants.*[1]

[1]Reported in 91 P. (2d) 718.

*The Attorney General* and *Lyle L. Iversen, Assistant,* for appellants.

*Neal, Brodie & Trullinger,* for respondent.

*Houghton, Cluck & Coughlin, amicus curiae* on behalf of appellants.

*Evans, McLaren & Littell, Allen, Froude & Hilen, Todd, Holman & Sprague, Tanner & Garvin,* and *Bayley & Croson, amici curiae* on behalf of respondent.

MILLARD, J.—The Washington Recorder Publishing Company publishes, in Olympia, a daily newspaper entitled the "Daily Olympian," which the publishing company distributes in Olympia and vicinity by approximately thirty-nine carriers, each of whom operates

under a written contract between the carrier and the publishing company, which contract is in the form designated as "The Little Merchant Plan." The contract which is used by the publishing company with its carriers reads as follows:

"The Daily Olympian Carrier's Agreement
"Route No..................

"I, ........................................................................ in consideration of being given the privilege of buying papers 'from The Daily Olympian and of distributing The Daily Olympian in that section of the city designated on map at The Daily Olympian office as Route No. .................., do hereby agree to the following rules and regulations and to such other rules as The Daily Olympian may from time to time designate, not inconsistent with this agreement:

"(1) In consideration of the privilege of buying papers from The Daily Olympian at its wholesale rate, I agree to pay for the same at the rate of ten cents per week per paper for all papers ordered, which number ordered will correspond with the number of subscribers carried on my route list. I further agree to pay to The Daily Olympian eleven cents per week for all subscribers on my route who pay in advance at The Daily Olympian office. All subscriptions paid in advance are to be credited to carrier at the regular current subscription rate.

"(2) The foregoing schedule of pay for papers is for all Daily Olympian carriers who have carried papers for The Daily Olympian at least six months. All others will pay an additional one cent per week per paper until they have carried The Daily Olympian for a period of six months of satisfactory service, after which the cost of papers will be reduced to the schedule set out in paragraph No. 1 above.

"(3) Statements are rendered Friday of each week, for the week ending the next day, Saturday, and I agree to have same paid in full before 3 o'clock p. m., Saturday, or not later than 5 p. m., the following Tuesday. This bill not to be subject to any discount or returns. All subscriptions paid in advance at The Daily

Olympian office will be credited on bill at regular current rate.

"(4) I will deliver the said papers to the subscribers on my route promptly and regularly seven days each week, at the established rate of fifteen cents per week, and will collect each Saturday morning for the week ending that night.

"(5) I agree to keep correct list of subscribers at all times on regular cards issued by The Daily Olympian, such list to be the sole property of The Daily Olympian and to be turned over to my successor or accredited representative of The Daily Olympian upon relinquishment of my route. This list will show to where each and every subscriber is paid, and I will make all collections due me from subscribers at the end of each week.

"(6) I will, at all times keep a satisfactory substitute, familiar with my route, to act in my place in case of absence.

"(7) It is further understood and agreed that this agreement may be cancelled at any time, at the discretion of The Daily Olympian, and that I will go around with my successor without charge a sufficient number of times to enable him to become familiar with the route and that before leaving the route, I will pay to The Daily Olympian all money I have collected from subscribers.

"(8) When contract is terminated at any other date than the first day of the week, I will make collections and pay to the Daily Olympian for papers for the preceding week only. The new carrier will pay a reasonable salary to carrier named in this contract for delivery of papers from first day of that week up to the date of termination of contract. On the termination of this contract The Daily Olympian may, at its option, on notice to the carrier, collect for the carrier the accounts that the carrier may have outstanding against subscribers on said route, and in that event shall account to the carrier for all collections that it shall make of such outstanding accounts.

"(9) I will not take the agency for, nor sell or deliver, any other newspaper while selling The Daily Olympian.

"(10) I will deliver free of charge all advertising checking copies required on my route and to any news stands now existing or which may hereafter be established on my route. I will also deliver free of charge complimentries and a reasonable number of sample copies of The Daily Olympian.

"(11) It is clearly understood that I am not an employe of The Daily Olympian. I am to buy from The Daily Olympian and will re-sell to the subscribers on my route, the difference between the wholesale and retail price being my compensation for delivery and collection.

"(12) I agree to deposit into a thrift account with the Circulation Manager of The Daily Olympian as trustee, one cent (1¢) each week during the life of this agreement for each paid subscriber to whom a paper was delivered by said Carrier.

"The Circulation Manager of The Daily Olympian is hereby designated as Trustee, and is hereby authorized to deposit such money as received by him in a local savings and loan association, such deposit to be entered in the name of the Carrier executing this agreement. The deposit books of the savings and loan association will be kept by the said Trustee in his possession.

"It is understood that the deposit shall be made each week until said Carrier has a total sum of $25 on such deposit and that such amount shall not be withdrawn during the life of this agreement. Deposits in excess of $25 may be withdrawn in case of emergency and with the consent of the Trustee.

"The Daily Olympian, in consideration of the making of the deposit by said Carrier, guarantees 2 per cent interest per year to be computed semi-annually, on the money deposited in addition to all interest paid by the local savings and loan association on such deposit, up to the sum of $50.

"It is understood and agreed that whenever said Carrier discontinues the sale of The Daily Olympian, the savings and loan account book will be delivered to him for his own use as soon as all financial obligations to The Daily Olympian are satisfied and it is herein agreed by the carrier and his guardian, that, if the car-

rier fails to fulfill his financial obligations to The Daily Olympian within 30 days after the discontinuance of his carrier contract, the Circulation Manager is hereby authorized to withdraw from the Carrier's account in the Savings and Loan sufficient amount of money to cover said obligations.

"(13) THIS CONTRACT IS NOT ASSIGNABLE OR TRANS-FERABLE.

"EXECUTED in duplicate this .......................... day of ................................ 19...........

"For THE DAILY OLYMPIAN: ........................................................
 Carrier

........................................ , ........................................
Circulation Manager Parent or Guardian

 ........................................
 Address "

The publishing company also publishes a special advertising paper, called the "Advertiser", once each week, which is distributed to all homes in Olympia. The carriers of the publishing company are offered the right to distribute that paper within their respective routes, but are not required to do so; and if they refuse to make the distribution, the distribution is made by others. The distribution of the Advertiser is independent of the distribution of the Daily Olympian and is entirely independent of the work performed by the carriers under their contract. If the boys deliver the Advertiser, they are paid from fifty cents to one dollar a week for such service. No charge is made to the recipients of the Advertiser. No control is exercised by the publishing company over the manner of delivery of the Advertiser other than to designate the area within which each boy is to make deliveries and the time by which deliveries are to be started.

Under the contract between the publishing company and its carriers for distribution of the Daily Olympian, the carriers purchase the papers from the publishing company at an agreed rate per week per paper and pay

therefor weekly. The carriers sell the papers to their customers in the route or territory designated and at the price stipulated in the contract. The money received from the sale of the papers by the carriers belongs to the carriers, who are not required to report to the publishing company the receipts from such sales. If the carriers fail to make collection, the loss falls upon the carriers and not upon the publishing company. No control is exercised by the publishing company over the time and manner of the distribution of the Daily Olympian by the carriers except that the distribution must be made in accordance with the contract, and no control is exercised over the time and method of collections. While there are numerous details of office administration and dealings between the publishing company and its carriers, such dealings are incidental to the contract and do not involve direction or control by the publishing company of the distribution and delivery of the papers or the collection by the carriers from the customers. When the carriers fail to make delivery of a paper and the publishing company makes delivery by Western Union messenger, the carrier is charged ten cents for such delivery as reimbursement to the publishing company. A bonus each month is given to the carrier who, during the preceding month, has had no complaint respecting the delivering of papers and who has paid the publishing company by Tuesday of each week for the papers drawn the preceding week.

As a part of the general plan and scheme of unemployment insurance contained in the Federal social security act, the unemployment compensation act (Laws of 1937, chapter 162, p. 574, Rem. Rev. Stat. (Sup.), § 9998-101 [P. C. § 6233-301] *et seq.*) of this state was enacted.

The division of unemployment compensation of the

department of social security made a ruling that the carriers of the publishing company are within the scope of the unemployment compensation act, for the reason that, under the contract, the carriers are employees, as employee is defined by Laws of 1937, chapter 162, p. 610, § 19, subd. (g), Rem. Rev. Stat. (Sup.), § 9998-119 [P. C. § 6233-317].

On the ground that the relation created by the contract is that of an independent contractor and that it is not under the unemployment compensation act by reason of the exceptions provided in § 19 (g) (5) of chapter 162, *supra,* reading as follows,

"Services performed by an individual for remuneration shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the director that:

"(i) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and

"(ii) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprises for which such service is performed; and

"(iii) Such individual is customarily engaged in an independently established trade, occupation, profession or business, of the same nature as that involved in the contract of service,"

the publishing company, on behalf of itself and all others similarly situated, commenced an action in the superior court for Thurston county for the purpose of obtaining a declaratory judgment as to the application of Laws of 1937, chapter 162, to newspaper carriers delivering on routes for the plaintiff. Trial of the cause to the court resulted in findings of fact and entry of a decree to the effect that the carriers of plaintiff are independent contractors, and the rela-

tionship between the plaintiff and its carriers is not one of employment as defined by the state unemployment compensation act. Defendants appealed.

At the time of the adoption of our unemployment compensation statute, the weight of authority was to the effect that carriers or distributors of newspapers who operated under contracts similar to the contract between the respondent and its carriers are independent contractors. A typical authority is *Gall v. Detroit Journal Co.*, 191 Mich. 405, 158 N. W. 36, 19 A. L. R. 1164. That was a personal injury case. The carrier was operating an automobile in the delivery of newspapers for the company under a written contract. That contract obligated the carrier to deliver and distribute from the publishing company's building to such persons at such places along such routes on such regular schedule as might be from time to time designated and furnished by the publishing company, the route and schedules and strict adherence thereto being the essence of the contract. The carrier was paid under his contract a stipulated weekly sum, less certain deductions for failures and delays on his part. He was to make the distribution according to his own means and methods of conveyances, which should be his exclusive property and not subject to the control by the newspaper company, except as to the results of the work. The contract might be terminated at any time by either party without notice. The newspaper company retained full control over the routes to be followed and the time schedule to be used, and the compensation was a fixed amount, except as it varied by reason of delays and deliveries by the carrier. It is clear that the newspaper company exercised more control over this carrier than the respondent has over its carriers. After recital of the principal pro-

visions of the contract, the supreme court of Michigan said:

"So far as the terms of the contract are concerned Rebtoy was certainly an independent contractor and not a servant. One whom the employer does not control, and has no right to control, as to the method, or means, by which he produces the result contracted for is an independent contractor. . . .

"Rebtoy did have a contract for a specific piece of work; that is, for the delivery of the papers. And it was none the less specific because the places to which the deliveries were to be made, and the persons to whom the papers were to be delivered, might change from day to day. The right, on the part of the company, to designate the persons and places was but a right to designate the result to be obtained, and did not give the company any control over the method for obtaining that result. Rebtoy was paid by the week, but so was the contractor in *Burns v. Paint Co.,* 152 Mich. 613 (116 N. W. 182, 16 L. R. A. [N. S.] 816). Rebtoy was not a licensed drayman, but that would not prevent his taking an independent contract, so far as the Journal Company was concerned. All of these things might be important in determining the relation of the employer and employed in a doubtful case, but they are not controlling in the face of a definite contract which clearly defines the relation. No reason is seen why a man may not agree, as an independent contractor, to deliver all, or part, of the papers printed by a publisher, of the groceries sold by a groceryman, or of the goods sold by a merchant, if the method and means for doing so are left entirely to him without any right of control by the employer. In the instant case either party had the right to terminate the contract at pleasure. That might be a very important circumstance in some cases, but under this contract any threat by the employer, express or implied, to use the right, for the purpose of controlling Rebtoy as to the method or means of making deliveries, would have been in violation of the terms of the contract. So long as the contract was adhered to, Rebtoy was independent in all of the methods of doing the work."

See, also, to the same effect, *Oklahoma Pub. Co. v. Greenlee*, 150 Okla. 69, 300 Pac. 684; *Bohanon v. James McClatchy Pub. Co.*, 16 Cal. App. (2d) 188, 60 P. (2d) 510; *Batt v. San Diego Sun Pub. Co.*, 21 Cal. App. (2d) 429, 69 P. (2d) 216.

*Wilson v. Times Printing Co.*, 158 Wash. 95, 290 Pac. 691, cited by appellants in support of the contention that the carriers are employees and not independent contractors, is distinguishable on the facts from the case at bar. In that case, we held that a holder of a rural newspaper route was not, as a matter of law, an independent contractor, but that the facts there presented made the question whether the holder of the route was an independent contractor or a servant of the newspaper publishing company, a question of fact for the jury. *Femling v. Star Pub. Co.*, 195 Wash. 395, 81 P. (2d) 293, also cited by appellants, is not in point. The Departmental opinion in that case is not a precedent, in view of the fact that, on rehearing, same was set aside, the judgment reversed, and the action dismissed on the ground that the carrier was not guilty of actionable negligence.

 Subdivisions (i) and (iii) of § 19, (g) (5) of the unemployment compensation act do not differ from the test employed at the common law and by this court in determination of the question whether the relationship is that of employee or independent contractor. In the Restatement of the Law of Agency, nine different items are recited as the principal elements to be considered in determining which relationship exists. In the enactment of the unemployment compensation statute, the legislature selected or picked out three elements to be considered. The legislature did not say, nor is the language capable of that interpretation, that each of those elements must exist one hundred per cent in order to establish the relationship of independent con-

tractor. Surely, the legislature did not intend to establish a different rule than that which has heretofore been employed by this court. To hold otherwise, would be to, in effect, eliminate the relationship of independent contractor. It would be a violent presumption indeed to hold that that was the purpose of the legislature. The definition by the editors of the Restatement of the Law of Agency, Vol. 1, 483-485, § 220, reads as follows:

"(1) A servant is a person employed to perform service for another in his affairs and who, with respect to his physical conduct in the performance of the service, is subject to the other's control or right to control.

"(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

"(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

"(b) whether or not the one employed is engaged in a distinct occupation or business;

"(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

"(d) the skill required in the particular occupation;

"(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

"(f) the length of time for which the person is employed;

"(g) the method of payment, whether by the time or by the job;

"(h) whether or not the work is a part of the regular business of the employer; and

"(i) whether or not the parties believe they are creating the relationship of master and servant.

"*Comment on Subsection* (1):

"*a. Servants not performing manual labor.* The word 'servant' does not exclusively connote a person rendering manual labor, but one who performs con-

tinuous service for another and who, as to his physical movements, is subject to the control or to the right to control of the other as to the manner of performing the service. The word indicates the closeness of the relationship between the one giving and the one receiving the service rather than the nature of the service or the importance of the one giving it. Thus, ship captains and managers of great corporations are normally superior servants, differing only in the dignity and importance of their positions from those working under them. The rules for determining the liability of the employer for the conduct of both superior servants and the humblest employees are the same; the application differs with the extent and nature of their duties.

"*b. Generality of definition.* The relationship of master and servant is one not capable of exact definition. It is an important relationship in that upon it depends the liability of the master to third persons and to his employees under the provisions of various statutes as well as under the common law; the relationship may prevent liability, as in the case of the fellow servant rule. It cannot, however, be defined in general terms with substantial accuracy. The factors stated in Subsection (2) are all considered in determining the question, and it is for the triers of fact to determine whether or not there is a sufficient group of favorable factors to establish the relationship. Where the inference is clear that there is, or is not, a master and servant relationship, it is made by the court; otherwise the jury determines the question after instruction by the court as to the matters of fact to be considered.

"*c. Independent contractors.* It is important to distinguish between a servant and an agent who is not a servant, since ordinarily a principal is not liable for the incidental acts of negligence in the performance of duties committed by an agent who is not a servant (see § 250). One who is employed to make contracts may, however, be a servant. Thus, a shop girl or a traveling salesman may be a servant and cause the employer to be liable for negligent injuries to a customer or for negligent driving while traveling to visit prospective customers. The important distinction is be-

tween service in which the actor's physical activities and his time are surrendered to the control of the master, and service under an agreement to accomplish results or to use care and skill in accomplishing results. Those rendering service but retaining control over the manner of doing it are not servants. They may be agents, agreeing only to use care and skill to accomplish a result and subject to the fiduciary duties of loyalty and obedience to the wishes of the principal; or they may be persons employed to accomplish or to use care to accomplish physical results, without fiduciary obligations, as where a contractor is paid to build a house. An agent who is not subject to control as to the manner in which he performs the acts that constitute the execution of his agency is in a similar relation to the principal as to such conduct as one who agrees only to accomplish mere physical results. For the purpose of determining liability, they are both 'independent contractors' and do not cause the person for whom the enterprise is undertaken to be responsible, under the rule stated in § 219."

Subdivisions (i) and (iii) of § 19 (g) (5) read as follows:

"Services performed by an individual for remuneration shall be deemed to be employment subject to this Act unless and until it is shown to the satisfaction of the director that:

"(i) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and . . .

"(iii) Such individual is customarily engaged in an independently established trade, occupation, profession or business, of the same nature as that involved in the contract of service."

As suggested by some of the counsel appearing as friends of the court, we read those two subdivisions together as follows:

"Such individual . . . [is] free from control or direction over the performance of such services

. . . and is customarily engaged in an independently established . . . occupation . . . or business . . ."

Let us compare the foregoing with the common law test of independent contractors as stated by us in the following cases:

"Among all the circumstances bearing upon the determination of the question whether Jones was an independent contractor or an employee, the right of the appellant to control him is the most decisive.

" 'An independent contractor is one who renders service to another in the course of an independent occupation, representing the will of his employer only as to the result of his work, and not as to the means by which it is accomplished. If the employer may control the manner of doing the work, the relation of master and servant exists'." *Leech v. Sultan R. & Timber Co.*, 161 Wash. 426, 297 Pac. 203.

"The contract, by its terms, established an independent employment, and the evidence shows that the work was so conducted. In *Larson v. American Bridge Co.*, 40 Wash. 224, 82 Pac. 294, 111 Am. St. 904, we said:

" 'The general test which determines the relation of independent contractor is that he shall exercise an independent employment, and represent his employer only as to the results of his work and not as to the means whereby it is to be accomplished. The chief consideration is that the employer has no right of control as to the mode of doing the work'." *Amann v. Tacoma*, 170 Wash. 296, 16 P. (2d) 601.

"Whether a person performing work for another is performing it as an independent contractor or as the employe of that other is a question not always easy of solution, but, as we held in *Glover v. Richardson & Elmer Co.*, 64 Wash. 403, 116 Pac. 861, the authorities agree that the test of the relationship is the right of control on the part of the employer. We there said:

" 'Whether a person performing work for another is performing it as an independent contractor or as the servant or employee of that other is a question not

always easy of solution, but all of the authorities agree that the test of the relationship is the right of control on the part of the employer. Thus in 26 Cyc. 1546, an independent contractor is defined as follows:

" ' "An independent contractor is one who, carrying on an independent business, contracts to do a piece of work according to his own methods, and without being subject to the control of his employer as to the means by which the result is to be accomplished, but only as to the result of the work." ' " *Carlson v. Collier & Son Corp.*, 190 Wash. 301, 67 P. (2d) 842.

"According to the accepted definition in this state, an independent contractor is one who, while rendering service in the course of an independent occupation, represents the will of his employer only as to the result of the work, and not as to the manner or means by which it is accomplished. The test by which it is determined whether the relation is that of employer and employee or that of independent contractor is whether or not the employer retained the right, or had the right under the contract, to control the mode or manner in which the work was to be done." *Sills v. Sorenson,* 192 Wash. 318, 73 P. (2d) 798.

The language used by us is practically the same as that employed in all jurisdictions of this country as the definition of the relationship of independent contractor. Obviously, the unemployment compensation act was drafted with the common law test as its basis. The right of control under subd. (i), § 19 (g) (5) is the principal consideration in determination of the relationship. Subdivision (iii), which prescribes the test that one is an employee unless he is customarily engaged in an independently established occupation or business, is a corollary of the test prescribed by subd. (i)—the right of control over the work or thing to be done. The language of subd. (iii) cannot reasonably be interpreted to mean that that subdivision requires the showing that the individual under consideration

customarily engages in *another* independently established business. The requirement is that the individual must be engaged in an independently established occupation or business. If one is engaged in his own independently established business, he is not subject to control. If an individual is subject to control or direction, he is pursuing another's business and not an independent business of his own.

In *Leech v. Sultan R. & Timber Co.*, 161 Wash. 426, 297 Pac. 203, we adopted the interpretation of the phrase as stated in *Fidelity & Cas. Co. v. Industrial Acc. Commission*, 191 Cal. 404, 216 Pac. 578, 43 A. L. R. 1304. That language reads as follows:

" 'Respondents emphasize the phrase "in the course of an independent occupation," and argue that the decedent was not pursuing an independent occupation because he was not doing hauling for any one else, and was not permitted so to do under the provisions of his contract for the term thereof. This is *non sequitur*. The question whether or not one is pursuing an independent occupation does not depend upon whether he is serving one person or many persons, but whether in the pursuit of his occupation he is acting upon his own behalf or as the servant of another. This is pointed out by the authors last quoted from in the same section: "If he never serves more than one person there is usually a presumption that he has no independent occupation; but this presumption is not conclusive. A single large railroad company, for example, might find work enough for a contractor to occupy his whole lifetime, yet leave him to work in perfect independence, accepting the results of his labor without even interfering with his choice of the mode and instruments of working. On the other hand, one may have many employers within a short space of time, yet be a mere servant to each of them in turn. . . . The one indispensable element to his character as an independent contractor is that he must have contracted to do a specified work and have the right to control the mode and manner of doing it" '."

This is a correct interpretation of subd. (iii), in which subdivision there is nothing to disclose that the individual must sell products of, or perform service for, third persons in order to qualify as an independent contractor. The statute states simply that he must be "customarily engaged in an independently established . . . business, of the same nature as that involved in the contract of service"—that is, his "business" is his own, not that of his employer. The courts have never held that, in the determination of the relationship of independent contractor, there must be an absolute and complete freedom from control. The common law test and the statutory test are the same. The statutory language "free from control or direction" does not mean that, if the publishing company has any degree of control over the carrier, that the carrier is an employee and not an independent contractor.

The extension of the term "employment" to include independent contractors and others not within the employer-employee relationship, which is one of the positions taken by the attorney general, invites a challenge to the constitutionality of the act, as the tax exacted of the employer would be a tax upon the naked right to contract. Our disposition of this appeal obviates necessity of discussion of the question whether such a tax would be an arbitrary use of the power of taxation because not predicated upon any reasonable grounds.

The common law test and the statutory test to the extent of subds. (i) and (iii) are the same; hence, it is clear, if there is any difference in the two tests, that difference must be found in subd. (ii), which reads as follows:

"Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places

of business of the enterprises for which such service is performed."

Alternative tests are provided by the foregoing subdivision. The first is inapplicable to the facts before us. The second test prescribed by subd. (ii) presents or raises the question of what constitutes the place or places of business of the respondent. We cannot agree with the contention of the attorney general that one who would otherwise be an independent contractor becomes an employee under the unemployment compensation act if he transacts any business related to the work at the office of the employer. It is argued that the carriers get their papers, hold meetings, and turn in their route lists, their subscriptions, and obtain notices of subscriptions or cancellations, at the newspaper office. If the position of the attorney general is correct, one engaged in an independent drayage service would become an employee because he obtained freight at a warehouse, filled out a bill of lading there and received instructions as to the name and address of the person to whom the freight should be delivered. It would be a strained construction to hold that transactions merely incidental to the main purpose of distribution of the papers under the contract, carried on at the office of the respondent publishing company, would bring the carrier within this provision of the statute. If the work covered by the contract of the carriers is to be performed at the place of business of the respondent, if such term is properly construed, that would present a situation intended to be covered by the statute.

■ One of the several common law tests or elements considered in the determination of the relationship between the parties is the place where the work is to be done. If the work is done upon the premises of the employer, the inference is strong that the work-

men are employees and not independent contractors. If a person is employed to work on the premises of another and for that other's benefit, such other person is, presumptively, an employee, and the burden is upon the one engaging the services of such person to establish the independence of the employee. *Simila v. Northwestern Imp. Co.*, 73 Wash. 285, 131 Pac. 831.

In drafting the statute, the legislators attempted to codify the common law. They intended that the common law test of employment relationship should likewise be the test under the unemployment compensation act. We cannot follow the argument of the attorney general to the effect that, since the respondent desires its newspapers to be distributed to the public, the places at which the newspapers are delivered to the respondent's subscribers all constitute places of business of the publisher. We agree with the argument of counsel for respondent that the specific service under the contract is the actual distribution and delivery of the papers, which necessarily are obtained at respondent's printing plant (which is the only real place of business of the company), but the delivery service is not performed at the place of business. The service covered by the contract, as counsel for respondent argue, commences at the first subscriber's residence or office after leaving respondent's printing plant. This is plain. It is unnecessary to cite authorities to sustain the position that the carriers are not performing any part of the services under their contract at the place of business of the respondent.

The attorney general argues that, in the absence of any charge of abuse of discretion, the court may not substitute its judgment for that of the director of social security in questions arising under the unemployment compensation act. If the statute make the director of the department the sole and exclusive

judge of the facts, when the undisputed facts establish as a matter of law that certain individuals are independent contractors and not employees under § 19 (g) (5) of the unemployment compensation act, there is nothing for the director to determine.

There has been no substitution by the court of its discretion for that of the director. The question presented is one of law—there is no room for any exercise of discretion by any administrative officer. We refrain from citation of authorities to sustain the self-evident proposition that the legislature could not deprive the superior court of its constitutional jurisdiction to determine the legality of the tax which the appellants seek to impose upon the respondent, a tax which respondent contends is not valid because respondent, under the act, is exempt from its application.

Any question as to the right to bring this action under the declaratory judgment act is foreclosed by *Acme Finance Co. v. Huse,* 192 Wash. 96, 73 P. (2d) 341, 114 A. L. R. 1345; and *McDermott v. State,* 196 Wash. 261, 82 P. (2d) 568.

Finally, appellants contend that the trial court erred in awarding costs against the state.

While this action was necessitated by the view of the law taken by appellants, thereby forcing respondent to litigation to have its rights ascertained, and it would be equitable to impose costs to be paid out of the unemployment compensation administration fund, the action was brought by the respondent against state officers in their official capacities; consequently, the action in effect is one against the state, and the award to the respondent of its costs and disbursements is an award of costs against the state. We have consistently held that, in the absence of statutory authority therefor, costs may not be assessed against the state. We

know of no authority for assessing costs against the appellants; and to that extent, the judgment is erroneous.

With the exception of the modification as to the award of costs, the judgment is affirmed.

SIMPSON and BEALS, JJ., concur.

GERAGHTY, J., concurs in the result.

BLAKE, C. J. (dissenting)—I dissent. Measured even by the common law concepts of *independent contractor* and *master and servant,* paper carriers, under such contracts as that with which we are here concerned, fall within the latter class. *Wilson v. Times Printing Co.,* 158 Wash. 95, 290 Pac. 691. But the relationship between the plaintiff and its carriers is to be measured by the statutory definition of "employment," and not by those common law concepts. That the statutory definition of employment is not an embodiment of those concepts, has already been recognized by this court. *McDermott v. State.,* 196 Wash. 261, 82 P. (2d) 568. In § 19 (g) (1) and (2), chapter 162, Laws of 1937, the legislature has defined "employment" in terms broad enough to include the common law concepts of both *independent contractor* and *master and servant.* In so defining the term, its obvious intent was to prevent the evasions which could arise from the refined distinctions which so often attend those common law concepts.

In a recent decision dealing with an identical definition of "employment," the supreme court of North Carolina said:

"The power of the General Assembly to broaden or restrict common law concepts is widely recognized (*New York Central Railroad Co. v. White,* 243 U. S. 188, 37 S. Ct. 247, 61 L. Ed. 667, L. R. A. 1917D, 1, Ann. Cas. 1917D, 629; *McDermott v. State of Washington,* 82 P. (2d) 568) and is not here challenged. Although

the extent of the area encompassed by some of the definitions may cause surprise, the duty of this court is to expound and to interpret the law as it is given to us, not to re-draft it along lines which may seem to us more conservative and more desirable. The economic and social evil of unemployment in its broad sweep frequently disregards man-made geographic and political boundaries; perhaps, it follows that former boundaries must be surrendered in seeking a remedy for such an evil. If new social evils produce, as counter-forces, new ideas of control of these evils, and such ideas are brought to us from the legislative forum, we must guard against falling victims to that suspicion which is born of the mere novelty of things." *Unemployment Compensation Commission v. Jefferson Standard Life Ins. Co.*, 2 S. E. (2d) (N. C.) 584.

