MOUNT PLEASANT CAB COMPANY *vs.* RHODE ISLAND UNEMPLOYMENT COMPENSATION BOARD.

CITY CAB COMPANY *vs.* SAME.

WILLIAM MAMBRO *d.b.a.* MAJESTIC CABS *vs.* SAME.

MAY 26, 1947.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

CAPOTOSTO, J. These are petitions for *certiorari* to quash the record of the respondent Rhode Island Unemployment Compensation Board, hereinafter referred to as the board, in so far as such record declares that the operators of certain livery cabs were employees of the petitioners and that, therefore, the petitioners were subject to the provisions of the unemployment compensation act, general laws 1938, chapter 284, as amended, hereinafter called the act. Pursuant to the writs, the board has made a return to this court of all pertinent records, including a certified transcription of the evidence presented at the hearing before it.

William Mambro does business under the name of Majestic Cabs. He also operates and controls the Mount Pleasant Cab Co. and the City Cab Company, Rhode Island corporations. Since the interests of all three petitioners are identical, we will consider the cases as if William Mambro were the sole petitioner. His contention is that the operators of the livery cabs, hereinafter referred to merely as cabs, which are owned by him or his corporations, are independent contractors by virtue of certain leases and that, therefore, he does not come under the act.

The only evidence before the board came from the petitioner, his accountant and a lessee. Petitioner's counsel was also permitted to make any explanations that he or the board deemed pertinent. Such evidence is undisputed and unchallenged.

It appeared in evidence that all the cabs were owned by the petitioner and that all necessary licenses were issued to him. Until April 1, 1944, the operators of the cabs were admittedly employees of the petitioner. At that time the petitioner changed his method of doing business and instituted the plan of letting out the cabs to acceptable operators under a contract in the form of a lease, the provisions of which were later changed and a new lease substituted therefor. As the provisions of the latter lease, hereinafter called the lease, are of controlling force in this case, we will set them out in detail, as they appear in a blank form admitted in evidence, together with such pertinent testimony as appears of record with reference to those provisions.

The lease provided that in consideration of the delivery by the lessor to the lessee of the cab therein described, the latter agreed as follows. Item 1, title to the property to be and remain in the lessor. Item 2, possession by the lessee to continue for a specified time. The testimony shows that all leases were for a period of one year. Item 3, the lessee to pay a definite amount for the entire term payable as follows: a certain sum upon the execution of the lease and the balance to be evidenced by lessee's promissory note, payable according to the tenor thereof. It appears in evidence that all lessees were required to pay $400 upon the signing of the lease, and $28 a week during the term of the lease. Item 4, the leased property to be used exclusively as a cab and always in compliance with the laws and regulations of city, state or federal governments. Item 5, rates for cab service charged by the lessee not to conflict with rates charged by the lessor for similar service. According to the evidence, the purpose of this provision was to protect the public against discrimination by securing uniformity of rates in all cases for the same

service, so that if the charge was "$.50 today to go downtown, that should be the same tomorrow."

The lease further provided: Item 6, calls made by the lessee from boxes controlled by the lessor to be submitted in proper order. The following explanation of this provision was given by the petitioner: "Q. What's the purpose of that? A. Proper order means that they (lessees) don't damage them. They (boxes) are put there by the telephone company and they don't want them damaged. I had to make a provision for that. Q. But the drivers are not required to use the call-boxes? A. No." Item 7, lessee to use the personal property exclusively for cab service. Item 8, at the expiration of the lease the personal property to be returned to the lessor in good condition, ordinary wear and tear excepted. Lessee to maintain said property in a fit and proper condition. During the term of the lease, the lessee to do no act or thing which may make void or voidable any insurance maintained by the lessor in relation to said personal property. In the matter of insurance the evidence shows that all insurance was carried in the name of the lessor, but that the premiums therefor were apportioned among the lessees and their proportionate parts were paid by them with the weekly payments. Item 9, the lease to terminate if the lessor was prevented from carrying out the provisions thereof by any law or governmental regulation. Item 10, the lessor, at his option, to terminate the lease upon breach of certain conditions. Item 11, waiver by the lessor of a breach of any provision in the lease to be considered as a waiver of that breach alone. Item 12, lessee not to sublet the personal property. And, lastly, item 13, any replacement of parts, additions or improvements to the personal property to become forthwith the property of the lessor.

Our review of the evidence is for the sole purpose of ascertaining whether there is any legal evidence in the record before us to support the finding of the board. The evidence clearly shows that, operating under this lease, the operators of the cabs were under no obligation to make any report or

give any information to the petitioner as to their hours of work; or where they operated from; or what their earnings were; or where they purchased oil and gasoline, except during wartime, when they were obliged to buy gasoline from the petitioner because all ration stamps for that commodity were then issued to the registered owner of the cabs; or where they had repairs made and what the cost was; or where they stored the cabs when not in operation. According to the evidence, so long as the provisions of the lease were complied with, the operators were free from any and all control by the petitioner. They were entirely free to work whenever and to whatever extent they chose, or not at all; to trade for supplies wherever it suited their convenience; to keep exclusively for themselves all net earnings, whether large or small; and they had to bear all losses, if any. The petitioner was in no way interested as to the manner in which the operators conducted their business or in the earnings that they should or might derive therefrom.

The interpretation of the pertinent provisions of the act is a matter of initial concern to this court. Such interpretation therefore requires a detailed reference to those provisions, for here, as in all cases of statutory construction, our primary duty is to ascertain the intent of the legislature and to give it effect. The most practical method that suggests itself to accomplish this purpose is to quote the various pertinent provisions of the act as they appear therein. Such pertinent provisions are as follows:

"Sec. 3. *Definitions*. . . .
    (4) 'Employee' means any person who is or has been employed by an employer subject to this act and in employment subject to this act.
    (5) 'Employer.'
        (a) Employer means:
            (1) Any employing unit which for some portion of a day . . . has or had in employment four or more individuals (irrespective of whether the same individuals are or were employed in each such day) . . .

(7) 'Employment.'
    (a) Employment, subject to the other provisions of this sub-section, means service, including service in interstate commerce, performed for wages or under any contract of hire, written or oral, express or implied. . . .
    (e) Services performed by an individual for wages shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the board that—
        (1) such individual has been and will continue to be free from control or direction by another with respect to the performance of such services, both under his contract of service and in fact; and
        (2) such service is either outside the usual course of the business for which such service is performed or such service is performed outside of all the places of business of the enterprise for which such service is performed; and
        (3) such individual is customarily engaged in an independently established trade, occupation, profession or business. . . .
(17) 'Wages' means all remuneration paid for personal services, on and after January 1, 1940 including commissions and bonuses and the cash value of all remuneration payable in any medium other than cash."

With reference to contributions, it is unnecessary for us to quote the provisions of the act. The contributions required by the act depend upon the *wages* paid by the employer and received by the employee during a given period.

According to familiar rules of construction the related sections of a statute should be interpreted so that all provisions are given effect, if reasonably possible. In this connection we note that the board rests its entire contention solely on its interpretation of sec. 3, subsection (7) (e) (1) (2) and (3), thus in effect disregarding all other pertinent provisions in the act that may shed light upon the legislative intent.

The legislature's basic definition of employment is to be found in sec. 3, subsections (7) (a) *and* (17). In subsection (7) (a) the act provides that employment, subject to the other provisions of that subsection, means *service* performed for *wages* or under any contract of *hire,* written or oral, express or implied. Subsection (17) provides that wages means all *remuneration* paid for *personal services,* including commissions and bonuses and the cash value of all remuneration paid in any medium other than cash. If the facts in any case come within this statutory definition of employment, then the relation of employer-employee arises by force of the act and both the employer and the employee, unless otherwise exempted by the act, would be subject to its provisions with reference to contributions. The employer would then be obliged to make the contributions required by the act, which contributions are to be determined by his payroll, meaning the total amount of *wages* paid to his employees for *employment,* as defined in the act. Likewise, the employee would be obliged to make the prescribed contributions for wages received in order to comply with the act.

The provisions of sec. 3, subsection (7) (e) (1) (2) and (3), upon which the board relies in the instant case, are inapplicable unless and until the relationship of employer-employee, as defined in the act, is established. In such a case we agree with the board that the burden to prove by clear evidence all of the elements mentioned in that subsection is plainly upon the individual who seeks to avoid the act; and that the failure by him to establish any one of those elements by such evidence would leave him subject to the act. *Industrial Comm'n* v. *Northwestern Mutual Life Ins. Co.,* 103 Colo. 550; *Creameries of America, Inc.* v. *Industrial Comm'n,* 98 Utah 571; *Unemployment Compensation Comm'n.* v. *Kirby,* 212 N. C. 763.

The board first contends that the act is a departure from common-law principles and establishes a statutory definition of the employer-employee status for the purposes of the act. Speaking generally, we agree with the board on this point.

It then proceeds to construe the act and does so by limiting itself to a consideration of sec. 3, subsection (7) (e) (1) (2) and (3), as hereinbefore indicated. Under this restricted view, it contends that, in order for an individual to avoid the force of the act, there must be proof, to the satisfaction of the board in every case and in all circumstances, that he has met the conditions for exemption in the above-mentioned subsection. We cannot follow such a view because it fails to give due consideration to other pertinent language and provisions of the act, as we have already pointed out.

In considering cases arising under the act, we are primarily concerned with the existence or nonexistence of the relationship which it defines. The use by a party of such terms as master and servant, or independent contractor, without reference to the act, is of little if any value. It is the intention of the legislature that will control. We are therefore in accord with the following cases, among others, cited to us by the board to the effect that the statutory definition in an unemployment compensation act ordinarily replaces the common-law principles as to master and servant, or independent contractor. *Washington Recorder Publishing Co.* v. *Ernst,* 199 Wash. 176; *In re Foy,* 10 Wash. 2d 317; *Industrial Comm'n.* v. *Northwestern Mutual Life Ins Co., supra; Unemployment Compensation Comm'n.* v. *Jefferson Standard Life Ins. Co.,* 215 N. C. 479; *Young* v. *Bureau of Unemployment Compensation,* 63 Ga. App. 130; *Unemployment Compensation Comm'n.* v. *Harvey,* 179 Va. 202.

Since in the instant case the evidence, which is fundamentally documentary in character, is undisputed and unchallenged, the controlling question is whether there was any legal evidence to support the finding of the board to the effect that the operators were receiving wages for personal services and thus were in the employment of the petitioner, as contemplated by the act. The only legal relationship created by the evidence in this case between the petitioner and the operators is that of lessor and lessee with reference to the cabs. Under the lease an operator acquires from the

petitioner the possession and beneficial use of the cab, in return for which he pays to the petitioner a stipulated sum of money as rent for such use for a definite time. So long as the operator complies with the conditions of the lease, the petitioner has no control over him; nor has the petitioner any interest in the doings of the operator; nor has he any power to make him work, or account for the money received by him from passengers. The operator is free to use or not to use the cab as he pleases; he may drive it when and where he wishes, or not at all; and he may retain for himself his whole earnings without accounting therefor at any time to the petitioner. Furthermore, the operator may store the cab, when not in use, in any place that is convenient for him; he may buy the necessary supplies and have repairs made at his expense and at places of his own choosing; and he pays the cost of insurance covering the cab.

■ The words "service" and "personal services", as they are used in sec. 3, subsections (7) (e) (1) (2) and (3) and (17), as such are not defined in the act. Where words are not otherwise defined in a particular statute, we must assume that the legislature intended to give to such words the meaning that is ordinarily and generally given to them. Webster's New International Dictionary (2d ed.) 1946, p. 2288, defines "service" as "Performance of labor for the benefit of another, or at another's command; attendance of an inferior, hired helper . . . ." The words "personal services" indicate that the service just defined is done personally by a chosen individual. When such meaning is given to those words and it is coupled with the definition of the word "wages" in the act, it is clear that for one to come within the purview of the act the word "employment", as therein defined, contemplates a performance of labor in the broadest sense of that word by one individual for the benefit of another, or at another's command, in return for which the individual rendering such service receives "wages" as defined in the act. Unless this fundamental relationship first appears by direct or circumstantial

evidence, or by reasonable inference therefrom, the act does not apply.

Whether or not an individual is within the scope of the act is ordinarily a question of fact for the board to determine. But it cannot act without legal evidence. In the instant case there is no legal evidence that the operators of the cabs were in the "employment" of the petitioner and therefore we are of the opinion that the petitioner did not come within the statutory definition of "employment", as set out in sec. 3, subsections (7) (a) and (17) of the act.

The decision of the respondent board, holding that the petitioner in each case is subject to the provisions of the state unemployment compensation act, is quashed, and the records certified to this court are ordered sent back to the respondent board.

*Walter J. Hennessey,* for petitioners.

*Marshall B. Marcus, William G. Grande,* for respondent.